Donna HOOVER, by and through Cynthia Hoover, her next friend and parent, on behalf of all girls in the State of Colorado similarly situated, Plaintiffs,

v.

Alvin J. MEIKLEJOHN, Jr., et al., Defendants.

Civ. A. No. 76 M 1007.

United States District Court, D. Colorado.

April 15, 1977.

Joan S. Brett and Morris W. Sandstead, Jr., Boulder, Colo., for plaintiffs.

Gaspar F. Perricone, Denver, Colo., and Gerald A. Caplan, Caplan & Earnest, Boulder, Colo., for defendants.

## MEMORANDUM OPINION AND ORDER

MATSCH, Judge.

In this class action under Rule 23(b)(2), Donna Hoover through her mother and next friend, representing all female persons of high school age or younger in the State of Colorado who are or may be affected by Rule XXI of the Colorado High School Activities Association, has invoked the jurisdiction granted by 28 U.S.C. § 1343(3) to seek a judgment declaring that rule to be unconstitutional, an order enjoining its enforcement, and mandatory affirmative relief under 28 U.S.C. § 2201 and 42 U.S.C. § 1983. The defendants concede jurisdiction and admit that their actions are under color of state law. They also agree that the prerequisites of Rule 23(a) have been met.

The plaintiff is 16 years old and a student in the eleventh grade at Golden High School, one of twelve senior high schools operated by Jefferson County School District R–1. The named defendants include all members of the board of education who govern that district.

The plaintiff is 5′4″ tall, weighs 120 pounds, and is in excellent physical condition. In the fall of 1976, Golden High School had a varsity soccer team which engaged in interscholastic competition with other public high schools in Colorado. The teacher-coach, Tracy Fifer, permitted participation by Donna Hoover as the only female on the team. She engaged in the conditioning and skills drills at the team's practice sessions and she played in junior varsity games, which were unofficial contests played between the same schools whose varsity teams met in sanctioned competition. These junior varsity matches were to assist the skills development of those who had not yet shown sufficient proficiency to play on the varsity team. Donna Hoover was the only female playing in those junior varsity games. Although she was stunned on one occasion as a result of a collision with a much larger player, she did not suffer any disabling injury in the games or in any practice sessions.

On or about September 28, 1976, the principal of Golden High School directed that the plaintiff be removed from the soccer team because her participation was in violation of Rule XXI, § 3 of the Colorado High School Activities Association. That is a voluntary, non-profit, unincorporated association of public high schools (together with some private schools as associate members) which is governed by a board of control composed of professional educators elected from eight districts. The purpose of the organization is stated in Article II of its constitution:

The purpose of the Association is to approve, promote, develop and direct all activities among its member schools, that will contribute to, or be a part of a well rounded and meaningful educational ex-

perience at the secondary school level. The Association shall strive to develop a unified and coordinated activities plan, without destroying the identity of any specific activity.

The Association shall be an instrumentality of the member schools for the accomplishment of the foregoing objectives.

The association sanctions interscholastic competition in many sports, including soccer. While schools may participate in programs which are not sanctioned by the association, its official sanction is required for state tournaments and the association promulgates rules governing eligibility, qualification of coaches and officials, and the official rules of play for each sanctioned sport. Additionally, a low cost insurance program is made available through the association.

While the association has no sex classification for cross country and baseball, the sport of soccer is limited by Rule XXI, § 3, as follows:

Participation in this activity shall be limited to members of the male sex.

NOTE: Because inordinate injury risk jeopardizes the health and safety of the female athlete, participation in this activity is limited to members of the male sex.

Soccer is a relatively new sport in Colorado high schools. It was first sanctioned five years ago and the state championship program was developed only two years ago. The decision to limit soccer to males resulted from consultation with a committee of the Colorado Medical Society designated as "Medical Aspects of Sports Committee." That group consists of seven physicians, from different geographical areas, whose practice involves pediatrics and orthopedics. Members of that committee testified at the trial of this case that the recommendation to classify soccer as a contact sport and to prohibit mixed-sex play was the result of a perception of physiological differences which would subject the female players to an inordinate risk of injury.

Primarily, the committee was concerned with risks attendant upon collisions in the course of play. While the rules of soccer prohibit body contact (except for a brush-type shoulder block when moving toward the ball), there are frequent instances when players collide in their endeavors to "head" the ball. In those instances, contact is generally in the upper body area.

There is agreement that after puberty the female body has a higher ratio of adipose tissue to lean body weight as compared with the male, and females have less bone density than males. It is also true that, when matured, the male skeletal construct provides a natural advantage over females in the mechanics of running. Accordingly, applying the formula of force equals mass times acceleration, a collision between a male and a female of equal weights, running at full speed, would tend to be to the disadvantage of the female. It is also true that while males as a class tend to have an advantage in strength and speed over females as a class, the range of differences among individuals in both sexes is greater than the average differences between the sexes. The association has not established any eligibility criteria for participation in interscholastic soccer, excepting for sex. Accordingly, any male of any size and weight has the opportunity to be on an interscholastic team and no female is allowed to play, regardless of her size, weight, condition or skill.

Interscholastic athletic competition is an integral part of the educational program of public high schools in Colorado. The prevalent view is set forth in Section 1 of the association's by-laws:

The program of the interscholastic athletics in high schools shall be so organized and administered as to contribute to the health, worthy use of leisure time, citizenship and character objectives of secondary education.

The defendants on the board of education and the professional educators in control of the activities association have concluded that the game of soccer is among those which serve an educational purpose and governmental funds have been provided for it. It is a matter of common knowledge

that athletics are a recognized aspect of the educational program offered at American colleges and universities and that many of them offer scholarships to males and females for their agreement to participate in intercollegiate sports competition. Such offers result from organized recruiting programs directed toward those who have demonstrated their abilities on high school teams. Accordingly, the chance to play in athletic games may have an importance to the individual far greater than the obvious momentary pleasure of the game.

 Accordingly, the claim of the plaintiff class in this case is properly characterized as a denial of an equal educational opportunity. The United States Supreme Court in *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) recognized the importance of a right to equal availability of what the state chooses to provide in the schools:

Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms. 347 U.S. at 493, 74 S.Ct. at 691.

*Brown* held that blacks were denied a constitutionally protected equality when they were forced to attend schools established only for those of the same race. As suggested by Justice Brennan in *Frontiero v. Richardson,* 411 U.S. 677, 686, 93 S.Ct. 1764, 1770, 36 L.Ed.2d 583 (1973), a classification according to sex is comparable to race in that it is "an immutable characteristic determined solely by the accident of birth."

This case has been presented and argued by both counsel within the framework of the two-tiered analysis familiar to equal protection decisions. If a "fundamental" right or interest is denied or impaired or if a classification is made on a "suspect" basis, the court must look with "strict scrutiny" to determine whether there is justification by a "compelling" state interest. Where there is neither a "fundamental" interest nor a "suspect" classification, a difference in the effects of state action is constitutionally permitted if it is "rationally related" to a "legitimate" state objective.

The defendants have argued and the plaintiff concedes that the Supreme Court has excluded education from "fundamental" rights by reserving that category to those which are explicitly or implicitly recognized in the language of the Constitution. *San Antonio School District v. Rodriquez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). While it is difficult to reconcile that result with the quoted language from *Brown,* an inflexible adherence to the two-tiered analysis would require only the "rational relationship" standard of review for a denial of equal educational opportunity if the classification is on a basis which is not "suspect."

The Supreme Court has exhibited an obvious reluctance to label sex as a "suspect" classification because the consequences of the application of the many "invidious" discrimination precedents to all separations by sex could lead to some absurd results. For example, would the Constitution preclude separate public toilets?

The difficulties involved in the application of the traditional two-tiered analysis to gender classifications have been well described in *Vorchheimer v. School District of Philadelphia,* 400 F.Supp. 326, 340–41 (E.D. Pa.1975), *rev'd.* 532 F.2d 880 (3d Cir. 1976), *cert. granted,* 429 U.S. 843, 97 S.Ct. 252, 50 L.Ed.2d 176 (1976). In a very recent

Supreme Court opinion, *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976), Mr. Justice Brennan, writing for the Court, attempted to define a new standard of review, saying

> To withstand constitutional challenge, previous cases establish that classifications by gender must serve *important* governmental objectives and must be *substantially* related to achievement of those objectives. 429 U.S. at 197, 97 S.Ct. at 457, emphasis added.

That language may be considered a "middle-tier approach," requiring something between "legitimate" and "compelling," viz., "important," and something more than a "rational" relationship but less perhaps than "strict scrutiny," viz., "substantially" related.

The artificiality of screening issues of constitutional moment through such a latticework of labels is becoming increasingly apparent. In his dissenting opinion in *Dandridge v. Williams,* 397 U.S. 471, 520, 90 S.Ct. 1153, 1179, 25 L.Ed.2d 491 (1970), Mr. Justice Marshall expressed his view that "equal protection analysis . . . is not appreciably advanced by the *a priori* definition of a 'right,' fundamental or otherwise." Similarly, Mr. Chief Justice Burger observed a few years later in *In re Griffiths,* 413 U.S. 717, 730, 93 S.Ct. 2851, 2859, 37 L.Ed.2d 910 (1972),

> In recent years the court, in a rather casual way, has articulated the code phrase "suspect classification" as though it embraced a reasoned constitutional concept. Admittedly, it simplifies judicial work as do "per se" rules, but it tends to stop analysis while appearing to suggest an analytical process. (dissenting opinion)

Most recently, in his concurring opinion in *Craig, supra,* Mr. Justice Stevens frankly expressed his own dissatisfaction with the majority analysis in these words:

> There is only one Equal Protection Clause. It requires every State to govern impartially. It does not direct the courts to apply one standard of review in some cases and a different standard in other cases. Whatever criticism may be levelled at a judicial opinion implying that there are at least three such standards applies with the same force to a double standard.
>
> I am inclined to believe that what has become known as the two-tiered analysis of equal protection claims does not describe a completely logical method of deciding cases, but rather is a method the Court has employed to explain decisions that actually apply a single standard in a reasonably consistent fashion. I also suspect that a careful explanation of the reasons motivating particular decisions may contribute more to an identification of that standard than an attempt to articulate it in all-encompassing terms. 429 U.S. at 211, 97 S.Ct. at 464.

Mr. Justice Powell also wrote a concurring opinion in *Craig,* in which he shared his fellow Justices' uneasiness with the familiar analysis. Although recognizing that the two-tiered approach now has substantial precedential support, he acknowledged that there are valid reasons for dissatisfaction with an approach which is "viewed by many as a result-oriented substitute for more critical analysis." 429 U.S. at 211, 97 S.Ct. at 464. For a thoughtful discussion of equal protection analysis, he referred to an article by J. Harvie Wilkinson III, "The Supreme Court, the Equal Protection Clause, and the Three Faces of Constitutional Equality," 61 Va.L.Rev. 945 (1975).

In that writing, Professor Wilkinson has made this constructive suggestion:

> The constitutional inquiry to test governmental denials of equal opportunity ought to weigh and to balance carefully the following elements. (1) the importance of the opportunity being unequally burdened or denied; (2) the strength of the state interest served in denying it; and (3) the character of the groups whose opportunities are denied. [footnote omitted] The test is very different from present suspect classification inquiry which focuses almost exclusively on the third element, purportedly ignores the first altogether if no suspect class is in-

volved, and scrutinizes state interests only in two widely variant categories of rational and compelling. 61 Va.L.Rev. at 991.

Professor Wilkinson's approach is strikingly similar to the approach suggested by Mr. Justice Marshall in *Dandridge, supra,* and in *Dunn v. Blumstein,* 405 U.S. 330, 335, 92 S.Ct. 995, 31 L.Ed.2d 274 (1971), which was applied by the court in *Gilpin v. Kansas State High School Activities Association, Inc.,* 377 F.Supp. 1233 (D.Kan.1974). Because of its flexibility and sensitivity to the notion of equality itself, Professor Wilkinson's method of analysis is particularly appropriate to the present case.

1. The importance of the opportunity being unequally burdened or denied.

■ The opportunity not merely burdened but completely denied to the plaintiff and the class she represents is the chance to compete in soccer as a part of a high school educational experience. Whether such games should be made available at public expense is not an issue. The content of an educational program is completely within the majoritarian control through the representatives on the school board. But, whether it is algebra or athletics, that which is provided must be open to all. The Court in *Brown* expressed a constitutional concern for equality in educational opportunity and this controversy is squarely within that area of concern. Accordingly, without reference to any label that would place this opportunity on one of two or more "tiers," it must be given a great importance to Donna Hoover and every other individual within her class. Surely it is of greater significance than the buying of beer, considered in *Craig, supra.*

2. The strength of the state interest served in denying it.

■ The defendants in this case have sought to support the exclusionary rule by asserting the state interest in the protection of females from injury in this sport. While the evidence in this case has shown that males as a class tend to have an advantage in strength and speed over females as a class and that a collision between a male and a female would tend to be to the disadvantage of the female, the evidence also shows that the range of differences among individuals in both sexes is greater than the average differences between the sexes. The failure to establish any physical criteria to protect small or weak males from the injurious effects of competition with larger or stronger males destroys the credibility of the reasoning urged in support of the sex classification. Accordingly, to the extent that governmental concern for the health and safety of ·anyone who knowingly and voluntarily exposes himself or herself to possible injury can ever be an acceptable area of intrusion on individual liberty, there is no rationality in limiting this patronizing protection to females who want to play soccer.

3. The character of the group whose opportunities are denied.

Women and girls constitute a majority of the people in this country. To be effective citizens, they must be permitted full participation in the educational programs designed for that purpose. To deny females equal access to athletics supported by public funds is to permit manipulation of governmental power for a masculine advantage.

■ Egalitarianism is the philosophical foundation of our political process and the principle which energizes the equal protection clause of the Fourteenth Amendment. The emergence of female interest in an active involvement in all aspects of our society requires abandonment of many historical stereotypes. Any notion that young women are so inherently weak, delicate or physically inadequate that the state must protect them from the folly of participation in vigorous athletics is a cultural anachronism unrelated to reality. The Constitution does not permit the use of governmental power to control or limit cultural changes or to prescribe masculine and feminine roles.

■ It is an inescapable conclusion that the complete denial of any opportunity to

play interscholastic soccer is a violation of the plaintiff's right to equal protection of the law under the Fourteenth Amendment. This same conclusion would be required under even the minimal "rational relationship" standard of review applied to classifications which are not suspect and do not involve fundamental rights. The governmental purpose in fielding a soccer team is to enhance the secondary school educational experience. The exclusion of girls to protect them from injury cannot be considered to be in furtherance of that educational objective. If the purpose of the exclusionary rule is the protection of health, safety and welfare of the students, it is arbitrary to consider only the general physiological differences between males and females as classes without any regard for the wide range of individual variants within each class. *Carnes v. Tennessee Secondary School Athletic Ass'n.,* 415 F.Supp. 569 (E.D.Tenn.1976).

While Rule XXI is invalid under either method of analysis, there is a difference between them which is revealed in considering both the remedy required here and the possible ramifications of this case for future controversies.

There is no contention in this case that the Constitution compels soccer competition with teams composed of the best players, regardless of sex. Donna Hoover sought a chance to play on the boys' team only because there is no girls' team. The parties here agree that the effective equalization of athletic opportunities for members of both sexes would be better served by comparable teams for members of each sex and that under current circumstances mixed-sex teams would probably be dominated by males. Accordingly, it is conceded that "separate but equal" teams would satisfy the equality of opportunity required by the Constitution. The "separate but equal" doctrine was articulated in *Plessy v. Ferguson,* 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896), approving racial separation in transportation facilities. The doctrine was rejected for education in *Brown, supra,* upon the conclusion that racial separation was inherently unequal because it involved a stigmatizing inferiority for the minority race. No such effect is conceivable for a separation of athletic teams by sex.

The Colorado High School Activities Association has sanctioned separate sex teams for basketball, gymnastics, swimming, tennis and track on a separate but equal basis pursuant to the following stated philosophy in the by-laws:

Section 2

The Colorado High School Activities Association, in order to effectively equalize athletic opportunities for members of both sexes, promotes and encourages the use of comparable athletic teams for members of each sex where selection for such teams is based upon competitive skills. This effort is to promote and encourage the growth of female involvement in athletic programs sponsored by this organization. The term "competitive skills" as used in this context refers to those skill [sic] presently possessed by athletes as a class composed of male athletes, as compared to the class of female athletes.

Given the lack of athletic opportunity for females in past years, the encouragement of female involvement in sports is a legitimate objective and separation of teams may promote that purpose. *Ritacco v. Norwin School District,* 361 F.Supp. 930 (W.D.Pa. 1973); *Bucha v. Illinois High School Association,* 351 F.Supp. 69 (N.D.Ill.1972). It may also justify the sanction of some sports only for females, of which volleyball may be an example.

■ Separate soccer teams for males and females would meet the constitutional requirement of equal opportunity if the teams were given substantially equal support and if they had substantially comparable programs. There may be differences depending upon the effects of such neutral factors as the level of student interest and geographic locations. Accordingly, the standard should be one of comparability, not absolute equality.

In arriving at the conclusion that the defendants are in violation of the Four-

teenth Amendment by providing interscholastic soccer only for male high school students, I am aware that there will be many concerned about the ramifications of this ruling. Football, ice hockey and wrestling are also made available only for males in Colorado, and volleyball is provided only for females. While there is now no reason to rule beyond the specific controversy presented by the evidence, it would seem appropriate to make some general observations about constitutional concerns in athletic programs supported by public funds.

The applicability of so fundamental a constitutional principle as equal educational opportunity should not depend upon anything so mutable as customs, usages, protective equipment and rules of play. The courts do not have competence to determine what games are appropriate for the schools or which, if any, teams should be separated by sex. What the courts can and must do is to insure that those who do make those decisions act with an awareness of what the Constitution does and does not require of them. Accordingly, it must be made clear that there is no constitutional requirement for the schools to provide any athletic program, as it is clear that there is no constitutional requirement to provide any public education. What is required is that whatever opportunity is made available be open to all on equal terms.

It must also be made clear that the mandate of equality of opportunity does not dictate a disregard of differences in talents and abilities among individuals. There is no right to a position on an athletic team. There is a right to compete for it on equal terms.

Adherence to the traditional equal protection analysis in these school sports cases can cause an unwelcome intrusion into issues which should be beyond the court's concern. It may here be observed that the flexibility which is suggested by common sense would be precluded by strict adherence to the two-tiered analysis if sex classifications are considered "suspect" or if some level of justification higher than "rational relationship" is required. In *Cape v.*

*Tennessee Secondary School Athletic Association,* 424 F.Supp. 732 (E.D.Tenn.1976), the holding was that the United States Constitution was violated because Tennessee high school girls could not play the same game of full court basketball permitted by the rules governing boys' teams. Is the full court dribble a matter of constitutional importance? In *Brenden v. Independent School District,* 477 F.2d 1292 (8th Cir. 1973), the court emphasized that "non-contact" sports were involved. Should equality of opportunity be measured according to style of play? Must there be "measure for measure" in each sport? Will girls be hurt by playing soccer with boys? The courtroom is not the place and the adversary process is not the method by which these questions should be answered. Fundamental principles of participatory democracy must not be trivialized by elevating every public controversy to a constitutional level.

This case has been kept within the confines of a particular sport because that is the way the parties chose to present it. If future controversies arise in other areas of athletic competition, it may be well to consider a broader perspective and to address the constitutional issue of equality of opportunity in the manner suggested by Professor Wilkinson. The importance of an opportunity for both sexes to participate in a total athletic program presenting a variety of choices for those with differing interests and abilities is far different from the importance of an opportunity for a boy to play volleyball or a girl to play football. The strength of the state interest and the character of the groups affected will also differ according to the scope of the total program.

Accordingly, whatever may be the validity of the two-tiered analysis to other questions of equal protection, it should be avoided in athletics as education to keep the courts out of the thicket of an acute analysis of rules and games. The question should not be whether there is a basis for each classification; but what is the relative importance of the individual interest affected compared with the governmental objective.

The plaintiff has asked for an order requiring the school board to permit her to play on the Golden High School soccer team and to enjoin the other defendants from imposing any penalty or other sanction upon that high school or any competing team because of that permission. Because there is no obligation to provide any soccer program and because equal opportunity can be given to the plaintiff class either by mixed-sex or comparable separate-sex teams, the defendants have a choice of actions to be taken. They may decide to discontinue soccer as an interscholastic athletic activity; they may decide to field separate teams for males and females, with substantial equality in funding, coaching, officiating and opportunity to play; or they may decide to permit both sexes to compete on the same team. Any of these actions would satisfy the equal protection requirements of the Constitution. What the defendants may not do is to continue to make interscholastic soccer available only to male students.

Upon the foregoing, it is

ORDERED and ADJUDGED that Rule XXI, Section 3 of the Colorado High School Activities Association is facially unconstitutional; that the defendants' exclusion of Donna Hoover and the class she represents from participation in any form of interscholastic soccer competition while male students are permitted to participate in such competition is a denial of equal educational opportunity, and, it is

ORDERED, that the defendants are permanently enjoined from the enforcement of or adherence to Rule XXI, Section 3 of the Colorado High School Activities Association and from providing interscholastic soccer only for male high school students.