DEPARTMENT OF CIVIL RIGHTS *ex rel* FORTON v WATERFORD TOWNSHIP DEPARTMENT OF PARKS AND RECREATION

Docket No. 71462. Argued June 5, 1985 (Calendar No. 21). Decided May 29, 1986.

The Michigan Civil Rights Commission found that the Waterford Township Department of Parks and Recreation had discriminated on the basis of sex in conducting a basketball program for elementary school children by having separate teams for boys and girls and by assigning different seasonal schedules for the teams by gender. The Oakland Circuit Court, Richard D. Kuhn, J., in a trial de novo, reversed the decision of the commission and held the program to be valid. The Court of Appeals, J. H. GILLIS, P.J., and D. F. WALSH and N. J. KAUFMAN, JJ., reversed (Docket No. 60304). The defendant appeals.

In an opinion by Justice BRICKLEY, joined by Chief Justice WILLIAMS and Justices LEVIN, CAVANAGH, and BOYLE, the Supreme Court *held:*

It is impossible to apply the proper constitutional standard in this case on appeal because incorrect standards were argued and applied in the courts below and there is an absence of necessary findings of fact, requiring reversal and a remand for a new trial.

1. The words "full and equal enjoyment" as used in the Civil Rights Act were not intended to create a standard less protective than the constitutional test developed by the courts in the course of interpreting the equal protection provisions of the United States and Michigan Constitutions. The goal of the Civil Rights Act was to broaden the scope of equal protection rather than the standard of equal protection.

2. There are two gender-based classifications at issue in this

REFERENCES

Am Jur 2d, Civil Rights §§ 88, 89, 494.

Validity, under federal law, of sex discrimination in athletics. 23 ALR Fed 664.

Application of state law to sex discrimination in sports. 66 ALR3d 1262.

See also the annotations in the ALR3d/4th Quick Index under Sex Discrimination.

case: separation of teams by sex and assignment of different seasonal schedules to such teams by gender. In analyzing cases alleging such gender-based discrimination, a two-pronged test is applied: whether the classification serves an important governmental interest and whether the classification is substantially related to fulfillment of that interest. Evaluation is made case by case, and each prong of the test is of equivalent weight. Even if a sufficiently important governmental interest is established, a gender classification may be invalidated because it fails to meet the requirement of the second prong. The burden of showing compliance with the test is on the state. A bare assertion of compliance by the state is insufficient to meet the burden; evidence must be produced that will persuade the court that the assertion is true.

3. In this case, the township had the burden of proof. Neither of the lower courts focused on that issue, however, merely considering the findings of the Civil Rights Commission in light of applicable law. In addition, none of the decisionmakers correctly applied the constitutional standard, and the hearing referee and the commission made mistakes of law. Although several governmental interests were identified, there were insufficient findings of fact to enable assessment on appeal of the requisite importance of any of the interests under the proper constitutional standard. Moreover, there were little or no findings of fact regarding the second prong of the test.

Reversed and remanded.

Justice RILEY, dissenting, stated that the complaint should be dismissed because the case was rendered moot before it was brought against the defendant and because the circumstances in this case do not warrant review.

Justice ARCHER took no part in the decision of this case.

124 Mich App 314; 335 NW2d 204 (1983) reversed.

### OPINION OF THE COURT

1. CIVIL RIGHTS — EQUAL PROTECTION — GENDER-BASED CLASSIFICATIONS.

The goal of the Civil Rights Act was to broaden the scope of equal protection rather than the standard of equal protection developed by the courts in the course of interpreting the equal protection provisions of the United States and Michigan Constitutions (US Const, Am XIV; Const 1963, art 1, § 2; MCL 37.2302[a]; MSA 3.548[302][a]).

2. CIVIL RIGHTS — EQUAL PROTECTION — GENDER-BASED CLASSIFICATIONS.

The test for determining whether a township's separation of

teams by sex in a basketball program for elementary school children and its assignment of different seasonal schedules to the teams so separated by gender constituted gender-based discrimination is whether an important governmental interest was served by the classification and, if so, whether the classification was substantially related to the interest.

3. CIVIL RIGHTS — EQUAL PROTECTION — GENDER-BASED CLASSIFICATIONS — BURDEN OF PROOF.

The burden of showing that a gender-based classification imposed by the state serves an important governmental interest and is substantially related to the interest is on the state; a bare assertion of compliance by the state is insufficient to meet the burden; evidence must be produced that will persuade the court that the assertion is true.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Michael A. Lockman,* Assistant Attorney General, for the plaintiff.

*Peter J. Donlin* for the defendant.

Amicus Curiae:

*Conlin & Sikorski* (by *Edmund J. Sikorski, Jr.*) for Michigan High School Athletic Association, Inc.

BRICKLEY, J. This lawsuit comes to us on the question whether the defendant township can operate a basketball program for elementary students that requires separate gender-based leagues playing at different times of the year, without violating the Civil Rights Act, MCL 37.2302; MSA 3.548(302) (hereinafter § 302). In order to answer that question, it is necessary first to decide whether this statute prescribes a standard prohibiting any rulemaking by the state based on gender per se, or whether it incorporates a two-part test coterminous with constitutional equal protection standards; second, whether this basketball program is permissible under the applicable standard.

I

This dispute began in January of 1978, when the Waterford Township Department of Parks and Recreation refused to allow Susie Forton to play elementary basketball in the wintertime boys' league because of her sex. Susie's exclusion was made on the basis of Waterford's specific rule prohibiting girls from playing in the elementary boys' basketball league; there was no evidence of any such rule or policy applying to boys' participation in the girls' league. The elementary basketball program is the only one of Waterford's athletic programs that restricts participation according to gender. Susie would have been eligible for the fall girls' basketball league, but she had chosen to play football during that season.

In February, 1978, the Oakland Circuit Court issued a temporary injunction that allowed Susie to play winter basketball. She was apparently permitted to play winter basketball for the remainder of her stay in elementary school.[1]

---

[1] Because Susie Forton completed the elementary program, the Fortons' case was moot by the time the Department of Civil Rights brought the February, 1979, charge against Waterford, which is the subject of this appeal.

In November of 1978, Waterford had amended its rules to allow up to two girls on each boys' basketball team and two boys on each girls' basketball team. During the 1979-80 season, one girl requested and was permitted to compete in the boys' basketball league. No boys requested to cross over to the girls' league.

We do not believe that these circumstances render this case moot, in part because the action has been brought by the Department of Civil Rights. That department is vested with broad powers, including the initiation and disposition of discrimination charges and the approval or disapproval of "plans to correct *past* discriminatory practices which *have* caused or resulted in a denial of equal opportunity with respect to groups or persons protected by [the civil rights act]." MCL 37.2602(c); MSA 3.548(602)(c) (emphasis added).

Nevertheless, even if Susie Forton's case were deemed technically moot, a similar situation involving another student could arise even under the amended rules. Moreover, because of the transitory nature of the educational process, this case is of that category of cases which

On February 8, 1979, a complaint was filed with the Civil Rights Commission charging Waterford with violating Susie Forton's constitutional equal protection rights under the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution and article 1, § 2 of the Michigan Constitution, as well as her civil rights under § 302(a) of the Civil Rights Act. Section 302(a) provides:

> *Except where permitted by law, a person shall not:*
>   (a) Deny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service because of religion, race, color, national origin, age, sex, or marital status. [MCL 37.2302(a); MSA 3.548(302)(a). Emphasis added.]

On November 23, 1979, after hearing testimony from Rex (Rocky) Forton, Susie's father and also a former baseball, basketball, and softball coach for Waterford, and from Richard Cartmill, the Interim Director of the Waterford Parks and Recreation Department, a hearing referee for the department issued an opinion in favor of Waterford finding

> [t]hat the facilities afforded the girls' fall basketball league are parallel and equal to those of the boys' basketball league held in the winter[, and] [t]hat the Waterford Township Department of Parks and Recreation['s] primary reason for the gender-based rule is that facilities are unavailable to accommodate everyone at the same time.

Primarily on the basis of these findings, among

are "capable of repetition, yet evading review." *Roe v Wade*, 410 US 113, 125; 93 S Ct 705; 35 L Ed 2d 147 (1973), quoting *Southern Pacific Terminal Co v ICC*, 219 US 498, 515; 31 S Ct 279; 55 L Ed 310 (1911). Therefore, we conclude our review is warranted.

others, the referee concluded that Waterford's sep-
arate but equal athletic program based on gender
was allowable in light of the limited number of
basketball facilities available. The referee noted
that a court will not interfere with a municipal
corporation's exercise of discretion "unless their
action is so clearly unreasonable as to amount to
an oppressive and manifest abuse of discretion."
Because the department had failed to show any
unlawful discrimination, the referee recommended
that the charge against Waterford be dismissed.

Upon review by the Civil Rights Commission,
the referee's recommendations were rejected. The
commission focused on its finding that Waterford's

> policy of gender-based exclusionary eligibility re-
> quirements is based in part on a concern that
> there would be an increased risk of injury to girls
> if they were to play in the same league with boys.

Among other things, the commission found that
Waterford's

> policy of sex segregation of the elementary basket-
> ball league operated to exclude all girls no matter
> what their individual coordination, endurance, sta-
> mina, strength, size or ability.

It found that

> [r]isk of injury in competitive athletics at this age
> level is not a function of any sex-related physiolog-
> ical differences between boys and girls[, and that]
> . . . [r]emoval of gender-based exclusionary poli-
> cies would not present a logistical problem in
> terms of running an elementary basketball pro-
> gram.

The commission's opinion, without reference to

constitutional equal protection standards, considered the permissibility of the "separate but equal facilities" provided by the Waterford elementary basketball program under § 302(a) of the Civil Rights Act. Relying on *Ferguson v Gies,* 82 Mich 358; 46 NW 718 (1890) (prohibiting separate but equal facilities based on race) and *Nat'l Organization for Women v Little League Baseball, Inc,* 127 NJ Super 522; 318 A2d 33 (1974) (also decided on the basis of a state civil rights act), the commission held that Waterford's "gender-based limitations are prohibited under the Elliott-Larsen Civil Rights Act." The commission apparently agreed with the department that cases brought under § 302 should be decided without reference to constitutional equal protection principles. The commission recommended that Waterford

> cease and desist from placing any gender-based limitations on the number of boys or girls who can participate on mixed teams and ensure that girls and boys are free to participate on mixed or separate basketball teams, solely in accordance with their athletic abilities. . . . It is further recommended that any future rules promulgated in connection with the operation of the basketball program be done without regard to sex.

Waterford petitioned the Oakland Circuit Court for review and appeal of the commission's order, and the court reversed the order in a trial de novo, upon the basis of the record made before the hearing referee. Like the referee, Oakland Circuit Judge Kuhn concentrated on Mr. Cartmill's testimony regarding the availability of facilities. He noted in the court's findings of fact that

> [a] primary reason for [Waterford's] separation of the elementary basketball leagues by gender is

[Waterford's] perception that facilities are unavailable to accommodate all children at the same time.

Rejecting the department's "per se test" for discrimination under § 302, the court applied an equal protection analysis, reasoning that the department's

interpretation of the Act would necessitate a finding that the Legislature intended to strip governmental public interest touching upon a gender-based classification of any constitutional protection; a finding that the Constitution protects only private, not public interests.

Thus, regarding the first issue, the circuit court held

that by inclusion of the phrase "except where permitted by law" as the introduction to MCLA 37.2302(a) [MSA 3.548(302)(a)] the Legislature, recognizing and protecting civil rights not enumerated in the Michigan Constitution, recognized also that those rights must be protected in an intelligent, orderly and just fashion, and thus intended to permit classification permitted by the supreme law of the land, the United States Constitution.

Employing a version of the equal protection analysis applicable to sex discrimination that was first articulated in a law review article cited by Justice Powell in his concurring opinion in *Craig v Boren,* 429 US 190, 210; 97 S Ct 451; 50 L Ed 2d 397 (1976), reh den 429 US 1124 (1977), the court applied a balancing test. It analyzed three relevant factors: (1) the importance of the opportunity being unequally burdened or denied; (2) the strength of the state interest served in denying it; and (3) the

character of the group whose opportunities are denied.

It identified the first (individual) interest as "the opportunity for a young girl to play basketball on a primarily male team, in the winter, without permission from league officials." The court concluded that, given the small number of actual cross-overs, "this opportunity is of little importance to the children affected." It identified the opportunities to compete with players of greater skill and to be free "from the public perception that one's skills are presumptively lower than another's" as of somewhat greater importance.

Regarding the state (or league's) interest, the court focused on the need to afford facilities to all players. It noted that this could be accomplished either through co-ed or separate leagues and that, therefore, the interest carried little weight. The court identified the strongest reason for allowing separate leagues as the fostering of women's sports at this stage of their development. Reviewing several federal cases that upheld separate teams for that reason, the court found that such teams "are necessary to provide meaningful athletic opportunities to women."

It concluded that the interests identified under the first factor of the test could not outweigh

> the opportunity to nurture talent in a realistic setting, playing with the group that, absent exceptional physical endowment, the child will play this game (competitively) with throughout life.

Finally, the court identified "the group whose opportunities are denied," those who wish to play football in the fall, as one which "is apparently quite small; one, or perhaps several out of 1800 children." It concluded that separate but equal

athletic teams formed on the basis of sex produced no badge of "stigmatizing inferiority" such as that present in any type of racial separation.

The circuit court, therefore, held that the classification adopted by Waterford in its regulations governing elementary basketball "comports with constitutional guarantees of equal protection, and thus comports with law pursuant to [§ 302(a)]." It dismissed the department's complaint.

The department appealed to the Court of Appeals, and that Court unanimously reversed, upholding the Civil Rights Commission's decision. In regard to the first issue, the Court of Appeals agreed with the majority in *Cheeseman v American Multi-Cinema, Inc,* 108 Mich App 428; 310 NW2d 408 (1981), lv den 413 Mich 890 (1982), finding that "the Legislature intended to apply a 'practical rule of reason' in § 302(a)." It therefore held that the language of that provision, " 'except where permitted by law,' " includes statutory, constitutional, and common law. *Dep't of Civil Rights ex rel Forton v Waterford Twp Dep't of Parks & Recreation,* 124 Mich App 314, 320-321; 335 NW2d 204 (1983).

Applying an equal protection analysis to the second question, the Court of Appeals noted that

> [t]o be constitutional, gender-based classifications must be substantially related to important governmental objectives. [*Id.,* p 321, citing *Craig, supra,* p 197.]

It then proceeded to conclude that

> the weight of authority seems to support the constitutionality of "separate but equal" sports teams for males and females. [*Id.,* p 322.]

Observing that Waterford's girls' and boys' leagues

are not equal, in that girls are forced to choose between football and basketball in the fall, whereas boys are not, the Court held that the separate leagues policy could not withstand equal protection analysis and was thus violative of § 302(a).

Waterford filed an application for leave to appeal to this Court, and leave was granted. 419 Mich 949 (1984). The parties were directed to include among the issues to be briefed:

> (1) whether the phrase "except as permitted by law" in MCL 37.2302(a); MSA 3.548(302)(a) includes statutory, constitutional, and common law; and
>
> (2) whether separate gender-based basketball leagues for elementary school children violate § 302(a) of the Michigan Civil Rights Act, MCL 37.2101 *et seq.;* MSA 3.548(101) *et seq.* [*Id.*]

The Michigan High School Athletic Association's request to file an amicus curiae brief was also granted.

II

The appellant township, while disagreeing with the Court of Appeals result, argues that the trial court and Court of Appeals were correct in using a constitutional analysis to interpret § 302(a), rather than accepting the appellee department's argument that any distinction based on gender is in violation of § 302(a) "except where permitted by law." The appellant would include under the rubric of "law," in addition to statutes, the constitution and common law. Thus, according to that reasoning, the reach of § 302(a) can be no further than the Equal Protection Clause of the constitution, and, since the constitution "permits" some

gender-based line drawing when it meets certain tests, so does § 302(a). Appellant sees the statute as a "codification of the legislators' perception of existing law; an affirmation of state policy and a statutory creation of a vehicle for enforcement of such principles." Lastly, appellant reviews current equal protection cases dealing with separate but equal gender-based athletic programs and finds them compelling a reversal of the Court of Appeals judgment.

Adding to the strange posture of this case, the appellees disagree with the rationale of the lower courts, while urging us to uphold the Court of Appeals result. The Attorney General, on behalf of the appellees, vigorously joins the "except as permitted by law" debate, postulating that the appellant's interpretation of § 302 of the Civil Rights Act as an adoption of the constitutional equal protection standard results in an emasculation of that important civil rights act. Rather than reading "as permitted by law" as allowing those practices that are not prohibited somewhere else, the appellees see those words of § 302(a) as a requirement that, in the absence of a specific "statute" (including ordinances and authorized administrative rules) or a constitutional provision allowing regulatory classifications on the basis of gender, age, or other protected classes, § 302(a) means what it says—no regulation on the basis of any of those protected classifications. Under this interpretation, it is argued, the possible arbitrariness of a prohibition of regulation per se based on these classifications can always be avoided by a specific piece of legislation or an administrative rule on an ad hoc basis.

This debate over the purpose and scope of the Civil Rights Act has troubled our courts on previ-

ous occasions.[2] The vigorous briefing and arguments on this question and its central focus in this case gives us a new and clear opportunity to respond to it.

The title of the act in part reads:

> AN ACT to define civil rights; to prohibit discriminatory practices, policies, and customs in the exercise of those rights based upon religion, race, color, national origin, age, sex, height, weight, or marital status . . . .

Section 302(a), repeated for ease of reference, provides:

> *Except where permitted by law, a person shall not:*
> (a) Deny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service because of religion, race, color, national origin, age, sex or marital status. [MCL 37.2302(a); MSA 3.548(302)(a). Emphasis added.]

The operative language of § 302(a)—"[d]eny an individual the full and equal enjoyment . . . because of religion, race, color, national origin, age, sex or marital status" is not a duplicate of the equal protection provision (§ 2) of the declaration of rights in article 1 of the Michigan Constitution, the operative language of which is:

---

[2] See *Dep't of Civil Rights v Beznos Corp,* 421 Mich 110; 365 NW2d 82 (1984); *Cheeseman v American Multi-Cinema, Inc,* 108 Mich App 428; 310 NW2d 408 (1981), lv den 413 Mich 890 (1982). In *Beznos,* we relied upon the "practical rule of reason" first articulated in *Cheeseman. Beznos* did not involve state action, as does the present case. Therefore, its approach is of limited use in analyzing the state action involved here. Our opinion in this case represents an attempt to articulate a general rule in response to the question: Do constitutional equal protection standards apply to suits involving state action brought pursuant to § 302?

No person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin.

Therefore, it is not clear on its face whether the use of the words "full and equal enjoyment" in the statute was intended to grant a higher standard of substantive equality than the constitutional minimum required by the words "equal protection."

It is clear, however, that § 302(a) does extend to equality in "goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation" and not just "equal protection of the laws" or "the enjoyment of his civil or political rights"; and that the constitutional classification of "religion, race, color, or national origin" has been enlarged in the statute with the addition of "age, sex or marital status." It is without doubt, then, that the Civil Rights Act is intended to enlarge the scope of civil rights beyond the state action limitation[3] of article 1, § 2 of the Michigan Constitution to cover nongovernmental conduct in the handling of public accommodations.

In spite of the fact that the statute does not employ language identical to the Equal Protection Clause, we conclude, on the basis of the wording of the statute, its purpose as manifested in its legislative history, and on the mandate of article 1, § 2 of the constitution itself, that the Legislature did not intend by the words "full and equal enjoyment" to create a standard less protective than the constitutional test developed by the courts in the course of interpreting the equal protection provisions of

---

[3] See *Woodland v Michigan Citizens Lobby,* 423 Mich 188, 204-212; 378 NW2d 337 (1985), for a discussion of the state action requirement, generally.

both the Michigan and the United States Constitutions.[4]

Prior to the passage of the bill, the House Analysis Section, in advising the House members reported,

> Although Michigan law offers protection in most situations from discrimination based on race, color, religion, national origin, and sex, the statutory prohibition against discrimination based on age is limited to areas of employment and housing, while prohibition against discrimination based on marital status is limited only to the area of housing. In areas such as public accommodations and education, an individual is not protected from discrimination based on age or marital status. Some persons contend that Michigan law should extend its civil rights protection to prevent discrimination based on age and marital status in those areas which presently offer civil rights protection based on race, color, national origin, religion, and sex. These persons also believe that areas such as education and public services should be included in a civil rights act.
>
> Further, existing civil rights protection is found in several different Michigan statutes; i.e., the Fair Housing Act, the Fair Employment Practices Act, the Public Accommodations Act and the Civil Rights Act. As a result, it is argued that anti-discrimination laws are not uniform and that enforcement is fragmented among several state agencies. For this reason, some contend that existing civil rights statutes should be rewritten and consolidated into 1 law, which would place legal and procedural recourse for all civil rights discrimination within the Department of Civil Rights, enabling the Department to provide more effective

---

[4] Should this Court in the future interpret the Equal Protection Clause of the Michigan Constitution as requiring a stricter standard than that established under the Fourteenth Amendment, it goes without saying that the standard to be applied to gender discrimination cases brought pursuant to the Michigan Civil Rights Act would be altered accordingly.

remedies for those who have been victimized by
unlawful discrimination. [Second Analysis, House
Bill 4055 (as enrolled) (December 30, 1976), p 1.]

The thrust of these comments seems to have
been the need to make uniform the prohibited
classifications in the different statutes dealing with
housing, employment, public accommodations, and
education; and to centralize their enforcement. In
addition, the emphasis appears to have been
placed on enlarging the scope of the act's coverage
—to private action—rather than on changing the
substance of the act's protection, or providing a
broadened definition of discrimination. Finally, the
Legislature's addition of "public service" to
§ 302(a), thereby including state action violations
that amount to constitutional deprivation with
private sector, non-state action legislative viola-
tions, can be explained by the fact that article 1,
§ 2 of the Michigan Constitution provides: "the
legislature *shall* implement this section by appro-
priate legislation." It is the only provision of the
Declaration of Rights to so provide.

Under the "Arguments For" section of the legis-
lative analysis appeared the following comment
which argues even more strongly that a constitu-
tional standard was envisioned as a standard for
§ 302(a):

The bill would include the concept of discrimina-
tion enunciated by the U.S. Supreme Court with
respect to equal protection under the Constitution.

We find nothing in the statute, as finally enacted,
that indicates the Legislature did not intend to
"include the concept of discrimination . . . with
respect to equal protection under the Constitu-
tion," and to "implement . . . by appropriate legis-
lation" that clause of the constitution.

Lastly, the title of the act includes the purpose to "prohibit discriminatory practices." Discrimination, in constitutional terms, refers to baseless and irrational line drawing. There are occasions when regulatory lines are legitimately drawn on the basis of some of the protected categories: age, e.g., distinguishing childhood from adulthood; marital status, e.g., tax laws, zoning laws; and national origin, e.g., immigration laws. When there is a sufficiently important governmental interest and the classification is adequately related to that interest,[5] it does not amount to discrimination to draw legislative lines on the basis of those classifications.

It would be anomalous at best and contradictory at worst to attempt to rid the state of discriminatory practices by the use of an arbitrary standard that would prohibit, in effect, any line drawn between the genders, regardless of its relevance to the purpose of the regulation, unless the Legislature, in its wisdom and its own good time, countervails it.

Since we find that it was the goal of the Legislature in adopting § 302(a) to broaden the scope, rather than the standard of equal protection under the Civil Rights Act, it is not necessary in the context of the resolution of this case to determine whether "permitted by law" has reference to constitutional and common law as well as statutory law.[6] We do not, however, wish to be understood as saying that the Civil Rights Act may not, in a

[5] See text at n 8.

[6] We note that it may never be necessary to determine this question. A constitutional provision, for instance, that sets arbitrary age limits for voting, running for public office, and consumption of alcohol perforce of constitutional supremacy would be unaffected by any statute, regardless of the legislative Saving Clause. If such a state constitutional provision fell below equal protection standards, it would presumably run afoul of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.

different factual setting, provide greater rights than past or future decisions interpreting the Equal Protection Clause of either the United States or the Michigan Constitution. Accordingly, we now examine prevailing case law to determine whether the instant basketball program passes constitutional and statutory muster.

### III

There are two gender-based classifications at issue in this case that must be evaluated according to the applicable standard. The first is the initial separation of basketball teams by sex, and the second is the assignment of different seasonal schedules to the teams according to gender. In evaluating whether these classifications by gender amount to impermissible sex discrimination under § 302(a) of the Civil Rights Act, under art 1, § 2 of the Michigan Constitution, or under the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution, the standard to be applied is the same.

The United States Supreme Court has adopted a "three-tiered" approach to questions of discrimination under the Equal Protection Clause. The upper two tiers apply to "suspect" classifications[7] and involve closer scrutiny by the court, whereas the lowest tier is a more deferential standard.

Historically, equal protection analysis began at the bottom tier, employing a "minimum rationality" or "rational basis" test in which a classifica-

[7] Classifications that are inherently suspect are subject to close judicial scrutiny. *Graham v Richardson,* 403 US 365, 372; 91 S Ct 1848; 29 L Ed 2d 534 (1971). "[C]lassifications based upon sex, like classifications based upon race, alienage, and national origin, are inherently suspect and must therefore be subjected to close judicial scrutiny." *Frontiero v Richardson,* 411 US 677, 682; 93 S Ct 1764; 36 L Ed 2d 583 (1973).

tion was required to be "reasonable in light of its purpose . . . ." *McLaughlin v Florida,* 379 US 184, 191; 85 S Ct 283; 13 L Ed 2d 222 (1964). Although the rational basis test was applied to early gender discrimination cases, see *Goesaert v Cleary,* 335 US 464; 69 S Ct 198; 93 L Ed 163 (1948), such cases are now analyzed using the "heightened scrutiny" of middle tier, or intermediate level, review.[8]

Under this level of scrutiny, there are two determinations that must be made. The first question is whether the classification serves an *important* governmental interest. The second question is whether the classification is *substantially* related to the achievement of the important governmental objective. *Craig v Boren,* 429 US 190, 197; 97 S Ct 451; 50 L Ed 2d 397 (1976), reh den 429 US 1124 (1977).

The *Craig* standard continues to be the one employed by the United States Supreme Court in gender discrimination cases. *Clark v Arizona Interscholastic Ass'n,* 695 F2d 1126 (CA 9, 1982), cert den 464 US 818 (1983). See *Lehr v Robertson,* 463 US 248; 103 S Ct 2985; 77 L Ed 2d 614 (1983); *Mississippi University for Women v Hogan,* 458 US 718, 724; 102 S Ct 3331; 73 L Ed 2d 1090 (1982); *Michael M v Superior Court,* 450 US 464; 101 S Ct 1200; 67 L Ed 2d 437 (1981).

In *Michael M,* the Court described the applicable standard as follows:

> Our cases have held, however, that the traditional minimum rationality test takes on a some-

---

[8] The "strict scrutiny" standard, under which courts must consider whether the claimed governmental interest is *substantial,* and whether the classification is *necessary* to accomplish that purpose, is generally confined to cases involving "fundamental rights" or highly suspect classifications. Claims of racial discrimination, for example, are analyzed using the strict scrutiny standard.

what "sharper focus" when gender-based classifications are challenged. . . . [I]n *Craig* . . ., the Court restated the test to require the classification to bear a "substantial relationship" to "important governmental objectives." [*Id.,* pp 468-469.]

[D]etrimental racial classifications by government always violate the Constitution, for the simple reason that, so far as the Constitution is concerned, people of different races are always similarly situated. [Citations omitted.] By contrast, while detrimental gender classifications by government often violate the Constitution, they do not always do so, for the reason that there are differences between males and females that the Constitution necessarily recognizes.

* * *

When men and women are not in fact similarly situated in the area covered by the legislation in question, the Equal Protection Clause is not violated. [*Id.,* p 478 (Stewart, J., concurring).]

Evaluation of the importance of the asserted governmental interest is performed on a case-by-case basis. Generally, the United States Supreme Court has "rejected administrative ease and convenience as sufficiently important objectives to justify gender-based classifications. [Citations omitted.]" *Craig, supra,* p 198. In addition, " 'archaic and overbroad' generalizations . . . concerning the financial position of servicewomen . . . and working women [citations omitted]," *id.,* as well as "outdated misconceptions concerning the role of females in the home rather than in the 'marketplace and world of ideas,' " *id.,* pp 198-199, were found to be insufficient justifications for statutory schemes involving gender classifications.

Once a sufficiently important governmental interest has been established, a gender classification may nevertheless be invalidated on the basis of the second portion of the test: the end-means

relationship. In *Craig, supra,* the constitutionality of Oklahoma statutes prohibiting the sale of beer containing 3.2 percent alcohol to males under the age of twenty-one and to females under the age of eighteen was challenged on equal protection grounds. In an opinion by Justice Brennan, the Court invalidated the laws, holding that although "the protection of public health and safety represents an important function of state and local governments[,] . . . [the] statistics in our view cannot support the conclusion that the gender-based distinction closely serves to achieve the objective . . . ." *Id.,* p 199-200. Apparently, one of the statistical studies showed that .18 percent of females and .20 percent of males in the relevant age group (eighteen to twenty) were arrested for alcohol-related driving offenses. The Court reasoned that

> [w]hile such a disparity is not trivial in a statistical sense, it hardly can form the basis for employment of a gender line as a classifying device. Certainly if maleness is to serve as a proxy for drinking and driving, *a correlation of 2% must be considered an unduly tenuous "fit."* [*Id.,* pp 201-202. Emphasis added.]

The Court further noted that because

> Oklahoma's statute prohibits only the selling of 3.2% beer to young males and not their drinking the beverage once acquired (even after purchase by their 18- [to] 20-year-old female companions), *the relationship between gender and traffic safety becomes far too tenuous to satisfy Reed's requirement that the gender-based difference be substantially related to achievement of the statutory objective.* [*Id.,* p 204. Emphasis added.]

Thus, the two parts of the intermediate level

test for impermissible gender discrimination are of equivalent weight. In order to justify a gender-based classification, the governmental interest must not only be deemed important, but also the classification must be substantially related to the fulfillment of that interest.

The "separate but equal" doctrine[9] has gained some measure of acceptance in cases involving gender classifications for sports activities. See, e.g., *Clark v Arizona Interscholastic Ass'n, supra,* pp 1129-1130, in which the court noted that "[w]hen schools have offered separate teams for boys and girls, courts have generally approved prohibitions of girls' participation on boys' teams."[10] However,

---

[9] The doctrine used in the context of athletic competition appears to have evolved out of application of the rational basis (lower level scrutiny) standard to gender discrimination cases. For example, in *Ritacco v Norwin School Dist,* 361 F Supp 930, 932 (WD Pa, 1973), the court relied on the separate but equal doctrine. It reasoned:

[S]ound reason dictates that "separate but equal" in the realm of sports competition, unlike that of racial discrimination, is justifiable and should be allowed to stand *where there is a rational basis for the rule.* [Emphasis added.]

The *Ritacco* court found such a rational relationship between the provision of separate but equal sports opportunities and the fostering of greater participation in sports. *Id.*

Likewise, the court in *Bucha v Illinois High School Ass'n,* 351 F Supp 69 (ND Ill, 1972), a case challenging in part the use of different rules in boys' and girls' swimming competition, also employed the rational basis test to support its approval of a separate but equal situation. The court reasoned that, because experts disagreed on what was "best" for female competition and because physiological and psychological differences had been shown, the differences in the programs were rationally supported. *Id.,* p 75.

[10] Cases that challenge prohibitions against mixed play when no separate teams are afforded have also approved of the doctrine. For example, a case that invalidated a rule excluding talented girls from the boys' high school football team on the basis of generalizations about the sexes that did not apply to the girls in question noted that the result might be different if separate teams had been provided. It found its decision to invalidate the rule to be all the more supported

when the school provides no corresponding girls' football team

we perceive no need to apply that doctrine independent of the constitutional standard articulated above.[11]

The intersection between the separate but equal doctrine and constitutional analysis may be expressed as follows. There must be an important governmental interest behind the creation of gender-based classifications, or separation. Something less than complete equality (i.e., no gender-based limitations at all) will be tolerated where such a situation is substantially related to the achievement of the important interest. "Separate but equal" is just one way of describing a potentially constitutional athletic program—a program that, nonetheless, must pass constitutional muster. If a separate but equal situation is to be sustained, it must be substantially related to the achievement of an important governmental interest.

on which girls may participate as players. [*Darrin v Gould*, 85 Wash 2d 859, 878; 540 P2d 882 (1975).]

Likewise, the court in *Hoover v Meiklejohn*, 430 F Supp 164, 169-170 (D Colo, 1977) stated that

[i]t is an inescapable conclusion that the complete denial of any opportunity to play interscholastic soccer is a violation of the plaintiff's right to equal protection of the law under the Fourteenth Amendment.

However, the *Hoover* court noted, and the parties apparently "conceded that 'separate but equal' teams would satisfy the equality of opportunity required by the Constitution." *Id.,* p 170.

In *Leffel v Wisconsin Interscholastic Athletic Ass'n,* 444 F Supp 1117 (ED Wis, 1978), a case upholding the exclusion of female high school students from tryouts for positions on boys' varsity teams, the same point was apparently conceded. In that case, there was no comparable girls' team. The court noted that it was "apparent that [plaintiffs] do not question whether separate teams for boys and girls, with comparable support and funding, are permissible under the fourteenth amendment." *Id.,* p 1121.

[11] Indeed, there may be a distinct danger in applying the doctrine independent of the constitutional test. For instance, the separate but equal doctrine could be used to defeat the purpose of affirmative action programs.

The burden of showing that the interest is important and that the means is substantially related to the desired end rests with the state, or township, in this case. In *Mississippi University for Women, supra,* Justice O'Connor noted

> that the party seeking to uphold a statute that classifies individuals on the basis of their gender must carry the burden of showing an "exceedingly persuasive justification" for the classification. [*Id.,* p 724.]

See also *O'Connor v School Dist 23 Bd of Ed,* 449 US 1301, 1305; 101 S Ct 72; 66 L Ed 2d 179 (1980) (Stevens, J., sitting as circuit justice on question of a stay pending appeal of permanent injunction); *Yellow Springs Bd of Ed v Ohio High School Athletic Ass'n,* 647 F2d 651, 657 (CA 6, 1981); *Force v Pierce City R-VI School Dist,* 570 F Supp 1020, 1022-1023 (WD Mo, 1983); *Brenden v Ind School Dist 742,* 342 F Supp 1224, 1232-1233 (D Minn, 1972). In *Yellow Springs, supra,* the court explained,

> Once a law is found to make a distinction on the basis of sex, the burden shifts to the defendants to prove the rule bears a fair and substantial relationship to an important state objective. [*Id.,* p 657.]

Although Justice Brennan would require the advocate of a gender-based classification to show "that a gender-neutral statute would be a less effective means of achieving that goal," *Michael M, supra,* p 490 (Brennan, J., dissenting), that does not appear to be the test adopted by the majority. "The relevant inquiry . . . is not whether the statute is drawn as precisely as it might have been, but whether the line chosen by the Califor-

nia Legislature is within constitutional limitations." *Id.,* p 473. Nonetheless, "a State's bare assertion that its gender-based statutory classification substantially furthers an important governmental interest is not enough to meet its burden of proof under *Craig* . . . . Rather, the State must produce evidence that will persuade the Court that its assertion is true." *Id.,* p 492 (Brennan, J., dissenting).

In applying these legal standards to the facts of the case at bar, it becomes evident that numerous mistakes of law were made by the decisionmakers below. First and foremost of these is in regard to the burden of proof.

At the hearing and in oral argument before the Civil Rights Commission, Waterford maintained that the department carried the burden of showing unlawful discrimination. In his conclusions of law, the hearing referee noted in error that "the *Michigan Department of Civil Rights has failed to show* any unlawful discrimination on the part of the Waterford Township Department of Parks and Recreation." (Emphasis added.) During oral argument before the commission, at least one commissioner correctly recognized that the burden shifted to Waterford once the department showed a difference in treatment based on gender. However, neither of the lower courts focused on the burden question, but merely considered the findings in light of the applicable law.

The burden of proof in this case clearly lay upon Waterford Township, in that two types of gender classification were shown to exist. Once a rule or law has been shown to make a classification or separation by gender, the burden shifts to its defenders to prove that it is substantially related to an important governmental interest.

A second type of error was made in the descrip-

tion and application of the legal standard. Although the standard changed with each forum that heard the case, none of the decisionmakers correctly applied the constitutional standard.

The parties themselves did not argue on the basis of *Craig.* Although the department does not favor adoption of constitutional standards at all in a § 302 case, counsel for the department did wish to make a record of Waterford's equal protection defense; therefore, he did argue to some degree using constitutional principles. However, his constitutionally based arguments focused not on the important interest-substantial relationship test, but on the potential abuses of the separate but equal doctrine. He maintained repeatedly that separate was inherently unequal, citing *Brown v Topeka Bd of Ed,* 347 US 483; 74 S Ct 686; 98 L Ed 873 (1954). Of course, at this point in time, the department's argument is confined strictly to the statute.

At both the hearing and commission levels, counsel for Waterford assumed that the proper standard was the rational basis test. He argued at one point:

> If we are serving *legitimate* government interests, then it is not unlawful. This is all a balancing between individual rights and the rights of society. [Emphasis added.]

Counsel then referred to *Ritacco* and *Bucha,* n 9, *supra,* which were pre-*Craig* cases employing the rational basis standard. Finally, in his brief to this Court, counsel argues strenuously in favor of the three-factor balancing test applied by the circuit judge, and advocates its adoption in lieu of the *Craig* standard.

The referee and commission also made mistakes of law. While the hearing referee appears to have

applied a constitutional standard, the commission relied strictly on the Civil Rights Act.

Although the referee cited *Craig,* he relied on pre-*Craig* cases as support for his finding that the concept of "separate but equal" as to gender is accepted in the case law dealing with athletic programs, and that the furtherance of a *"legitimate* governmental interest" is all that must be shown. Like the Court of Appeals, the referee seems to have been sidetracked by the separate but equal doctrine; he thus failed to apply the correct constitutional standard that would have required the finding of an *important* governmental interest and a substantial relationship between that interest and the gender-based classification in question.

The commission's opinion is equally flawed. It relies strictly on § 302 in its condemnation of the separate but equal doctrine as it is applied in this case. For the reasons articulated in Part II of this opinion, we do not agree with the commission's approach.

The circuit court applied a three-factor balancing test, although it articulated the "important interest/substantial relationship" test in its conclusion. In rejecting the three-tiered approach[12] adopted by the United States Supreme Court, the circuit judge noted

> that all equal protection tests represent a method employed to explain decisions that actually apply a single standard, imposed by the Equal Protection Clause of [sic, the] Fourteenth Amendment, in a reasonably consistent fashion, to do justice in heterogynous [sic, heterogeneous?] fact situations.

We perceive no reason to reject the applicable

[12] See text at n 7.

constitutional standard in favor of this three-part balancing test advocated in a law review article that happened to have been cited in a United States Supreme Court concurring opinion. Like that Court, which has repeatedly reaffirmed the important interest-substantial relationship standard, we prefer this time-tested, though imperfect, middle tier end-means analysis.

In contrast to the circuit judge's thorough, though perhaps misguided, analysis, the Court of Appeals, in an almost summary fashion, concluded that the separate but equal doctrine is generally accepted in this context, but that in this case, the leagues are not equal. See *Forton, supra,* pp 322-323. The correct standard was articulated, see *id.,* p 321, but not applied.

Because these incorrect legal standards were argued and applied below, it is impossible on review to apply the proper standard to this case. Although several governmental interests were identified below,[13] there was insufficient fact-finding to enable this Court to assess the requisite importance of any one of them under the proper constitutional standard.[14] Moreover, there was lit-

---

[13] The circuit judge identified three asserted interests, only the third of which he found to be sufficiently important under the standard that he applied:

(a) Waterford's "interest in conveniently dividing the leagues to afford facilities to all";

(b) Waterford's "interest in providing athletic opportunities to a maximum number of students"; and

(c) Waterford's interest in "foster[ing] women's sports at this, the time of their real flowering."

Two additional interests may be culled from the record below:

(d) Waterford's interest in preventing injury to the female elementary basketball players; and

(e) Waterford's interest in maintaining gender-based leagues for their own sake.

[14] Several of the identified interests have been found to be sufficiently "important" in other cases. See, e.g., *Clark v Arizona Inter-*

tle or no testimony or fact finding regarding the second part of the constitutional test: the end-means relationship.

This second part of the standard asks whether the gender classification in question is substantially related to the important governmental interest. For example, if there were sufficient facts upon which to conclude that "fostering girls' athletics" was a sufficiently important governmental interest, the question would be whether splitting the leagues by gender is substantially related to the accomplishment of that objective. The issue was never pursued on any level of this litigation.

The United States Supreme Court has said that

> [t]he purpose of requiring that close relationship is to assure that the validity of a classification is determined through reasoned analysis rather than through the mechanical application of traditional, often inaccurate, assumptions about the proper roles of men and women. [*Mississippi University, supra,* pp 725-726.]

Generally, "[t]he relevant inquiry, however, is not whether the statute is drawn as precisely as it might have been, but whether the line chosen . . . is within constitutional limitations." *Michael M, supra,* p 473. In other words, the gender classification need not be absolutely *necessary* to accomplish the desired goal (as would be required under "strict scrutiny") but, again, need only be "substantially related."

This second part of the analysis is not a rubber stamp test, however. For example, in *Craig,* despite statistics supporting the state's view that

scholastic Ass'n, supra (fostering girls' athletics); *Striebel v Minnesota State High School League,* 321 NW2d 400, 402 (Minn, 1982) (facilities). However, in those cases, there was specific testimony and fact-finding to support the conclusions.

young men were more likely to drink and drive
than young women, Justice Powell was "not per-
suaded that these facts and the inferences fairly
drawn from them justify this classification . . . ."
*Craig, supra,* p 211. However, in other cases, the
Court has deferred to a lower court in making this
determination, "[w]here . . . differing speculations
as to the effect of a statute are plausible . . . ."
*Michael M, supra,* p 474, n 10.

Facts and circumstances thus play a large part
in assessing the end-means relationship. While the
relationship need not be perfect, it should be close.

In the absence of facts and circumstances that
would enable us to apply the constitutional stan-
dard to the case at bar, we must turn to the trial
court for the necessary findings. The opinion of the
Court of Appeals is thus reversed and the case
remanded to the trial court for retrial and a
decision consistent with this opinion.

WILLIAMS, C.J., and LEVIN, CAVANAGH, and
BOYLE, JJ., concurred with BRICKLEY, J.

RILEY, J. I respectfully dissent.

This case was rendered moot prior to the time
the Department of Civil Rights filed the complaint
against the Waterford Township Department of
Parks and Recreation in February, 1979, because,
as the majority carefully notes, Susie Forton was
previously granted (February, 1978) a temporary
injunction permitting her to play winter basket-
ball for the remainder of her stay in elementary
school. While I acknowledge that there is prece-
dent for this Court to review matters that are
moot if the circumstances warrant, I do not believe
that this is such a case. I am persuaded that it
makes little sense in the context of the facts before
us to engage in exhaustive constitutional analyses

which not only do not lead to resolution of this case but, rather, return it to the trial court for another several years of litigation.

I would dismiss the complaint filed against the defendant on February 8, 1979, thus rendering any action taken on the complaint a nullity, including the Court of Appeals opinion which I would hold also to be a nullity.

ARCHER, J., took no part in the decision of this case.