592 N.W.2d 370 (1998)
Tracy NEAL, Helen Gibbs, Stacy Barker, Ikemia Russell, Berth Clark, Linda Nunn, and Jane Doe, on behalf of themselves and all others similarly situated, Plaintiffs-Appellees,
v.
MICHIGAN DEPARTMENT OF CORRECTIONS, Director of Michigan Department of Corrections, Joan Yukins, Sally Langley, Carol Howes, Robert Salis, Cornell Howard, Officer Portman, and Officer Robey, Defendants-Appellants (On Rehearing), and
Officer Tate, Officer Ellison, and Officer Gallagher, Defendants.
Docket No. 198616.
Court of Appeals of Michigan.
Submitted September 4, 1997, at Grand Rapids.
Decided June 5, 1998, at 9:15 a.m.
Submitted on Rehearing September 23, 1998.
Decided on Rehearing November 24, 1998, at 9:20 a.m.
Released for Publication February 23, 1998.
*372 Law Offices of Deborah LaBelle (by Deborah LaBelle, Richard A. Soble and Molly Reno), Ann Arbor, Goodman, Eden, Millender & Bedrosian (by Mary P. Minnet )Detroit, and Gail A. Grieger, Livonia, for the plaintiffs.
Frank J. Kelley, Attorney General, Thomas L. Casey, Solicitor General, and Lisa C. Ward, Assistant Attorney General, for the defendant.
Before O'CONNELL, P.J., and MacKENZIE and GAGE, JJ.

*371 ON REHEARING
MacKENZIE, J.
This is a class-action suit brought, in relevant part, under the Civil Rights Act, M.C.L. § 37.2101 et seq.; MSA 3.548(101) et seq., by female prisoners housed in facilities operated by the Michigan Department of Corrections (MDOC). Defendants are the department, its director, and several wardens, deputy wardens, and corrections officers employed by the MDOC. Defendants appeal by leave granted from a circuit court order denying their motion for summary disposition pursuant to MCR 2.116(C)(4), (7), and (8). We affirm.
The case arises out of allegations that male corrections personnel have systematically engaged in a pattern of sexual harassment of female inmates incarcerated by the MDOC. Specifically, plaintiffs' complaint alleged that the MDOC assigns male officers to the housing units at all women's facilities without providing any training related to cross-gender supervision; that women are forced to dress, undress, and perform basic hygiene and body functions in the open with male officers observing; that defendants allow male officers to observe during gynecological and other intimate medical care; that defendants require male officers to perform body searches of women prisoners that include pat-downs of their breasts and genital areas; that women prisoners are routinely subjected to offensive sex-based sexual harassment, offensive touching, and requests for sexual acts by male officers; and that there is a pattern of male officers requesting sexual acts from women prisoners as a condition of retaining good-time credits, work details, and educational and rehabilitative program opportunities. The complaint also alleged that the inmates were subject to retaliation for reporting this gender-based misconduct. Plaintiffs claimed that these actions, and defendants' failure to protect female inmates from this misconduct through adequate training, supervision, investigation, or discipline of MDOC employees, constitute gender-based discriminatory conduct, sexual harassment, and retaliation in violation of the Civil Rights Act. They sought injunctive and declaratory relief, their initial claim for monetary damages having been ordered dismissed.

I
The purpose of the Civil Rights Act is to prevent discrimination directed against a person because of that person's membership in a certain class and to eliminate the effects of offensive or demeaning stereotypes, prejudices, and biases. Noecker v. Dep't of Corrections, 203 Mich.App. 43, 46, 512 N.W.2d 44 (1993). The act is remedial and must be liberally construed to effectuate its ends. Reed v. Michigan Metro Girl *373 Scout Council, 201 Mich.App. 10, 15, 506 N.W.2d 231 (1993).
Article 3 of the Civil Rights Act prohibits discrimination in public accommodations and public services. Subsection 302(a) states:
Except where permitted by law, a person shall not:
(a) Deny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service because of religion, race, color, national origin, age, sex, or marital status. [MCL 37.2302(a); MSA 3.548(302)(a) ].
Section 103 of the act, M.C.L. § 37.2103; MSA 3.548(103), declares that sexual harassment is a form of sex discrimination.
Section 301 defines "place of public accommodation" and "public service" as those terms are used in subsection 302(a). It states:
(a) "Place of public accommodation" means a business, or an educational, refreshment, entertainment, recreation, health, or transportation facility, or institution of any kind, whether licensed or not, whose goods, services, facilities, privileges, advantages, or accommodations are extended, offered, sold, or otherwise made available to the public....
(b) "Public service" means a public facility, department, agency, board, or commission, owned, operated, or managed by or on behalf of the state, a political division, or an agency thereof, or a tax exempt private agency established to provide service to the public. [MCL 37.2301; MSA 3.548(301) ].
Finally, § 303 of the act creates an exemption under article 3 for private clubs:
This article shall not apply to a private club, or other establishment not in fact open to the public, except to the extent that the goods, services, facilities, privileges, advantages, or accommodations of the private club or establishment are made available to the customers or patrons of another establishment that is a place of public accommodation or is licensed by the state.... [MCL 37.2303; MSA 3.548(303) ].
In denying defendants' motion for summary disposition with respect to plaintiffs' Civil Rights Act claim, the trial court ruled that the MDOC is a "public service" agency prohibited from engaging in gender-based discrimination or harassment under subsection 302(a) of the act. The court further noted that the act does not specifically exclude prisoners from its coverage and declined to read such an exclusion into the act.

II
The narrow issue before us is whether the MDOC correctional facilities are places of "public service" in which discrimination against inmates, based on sex, is prohibited. The United States Supreme Court's recent decision in Pennsylvania Dep't of Corrections v. Yeskey, 524 U.S. 206, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998), leads us to conclude that the MDOC facilities are places of "public service" within the meaning of subsection 301(b).
The question in Yeskey was whether a state prisoner could maintain a claim against a state department of corrections under another civil rights statute, the Americans with Disabilities Act of 1990(ADA), title II of which prohibits discrimination by a "public entity" against individuals with a disability. 42 USC 12132. The statutory definition of "public entity" at issue in Yeskey is similar to the definition of "public service" set forth in subsection 301(b): "any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 USC 12131(1)(B). Writing for a unanimous Supreme Court, Justice Scalia held that "the statute's language unmistakably includes State prisons and prisoners within its coverage." 118 S.Ct. at 1954. Emphasizing the broad statutory language, the Court stated that "the ADA plainly covers state institutions without any exception that could cast the coverage of prisons into doubt." Id. The Court therefore concluded that "[s]tate prisons fall squarely within the statutory definition of `public entity'...." Id.
The Supreme Court's reasoning in Yeskey applies equally to this case. Under subsection *374 301(b), a "public service" includes "a public facility, department, agency, board, or commission, owned, operated, or managed by or on behalf of the state...." The MDOC is a state agency, and this state's correctional facilities are operated by it. Any "exception that could cast the coverage of prisons into doubt," 118 S.Ct. at 1954, is conspicuously absent from the unambiguous statutory language of the Civil Rights Act. Thus, under the plain language of subsection 301(b), the MDOC clearly falls within the broad statutory definition of a "public service." Defendants essentially concede as much.
Defendants argue that even if the MDOC is a "public service," its prisons are nevertheless not required to comply with subsection 302(a) of the Civil Rights Act because they fall within the § 303 exemption for "private club [s], or other establishment[s] not in fact open to the public." We reject this argument. The fact that the MDOC operates buildings that are not fully open to the public does not mean that the MDOC itself is a "private club or other establishment" not open to the public. There is a distinction between a state agency and the buildings that house that state agency. There are presumably many departments of state government (this Court included) that operate facilities that members of the public may not enter at their will. This, however, does not mean that those departments themselves are private establishments not open to the public; it merely means that the physical structures used by those departments are not fully accessible to the public.
Moreover, "[r]esident inmates are obviously members of the public in a general sense." Martin v. Dep't of Corrections, 424 Mich. 553, 565, 384 N.W.2d 392 (1986) (Cavanagh, J., dissenting). Our Supreme Court has held that prisoners are members of the public for purposes of the governmental tort liability act, M.C.L. § 691.1401 et seq.; MSA 3.996(101) et seq. Green v. Dep't of Corrections, 386 Mich. 459, 464, 192 N.W.2d 491 (1971). The Supreme Court has also held that prisoners are members of the public for purposes of the Administrative Procedures Act, M.C.L. § 24.201 et seq.; MSA 3.560(101) et seq. Martin, supra, p. 555, 384 N.W.2d 392. Civil rights acts are to be liberally construed to provide the broadest possible remedy. Reed, supra. Only by reading "private club, or other establishment not in fact open to the public" in its most restrictive, literal sense, may a correctional facility be deemed to be "not open to the public." We therefore conclude that the § 303 exemption does not relieve defendants of the obligation to act in conformity with subsection 302(a) of the Civil Rights Act.

III
Defendants contend that even if the § 303 exemption does not apply to state-run correctional facilities, subsection 302(a) of the Civil Rights Act was not intended to protect prisoners. Again, we disagree.
We begin by reviewing the legislative purpose of the Civil Rights Act in general and subsection 302(a) in particular. Const 1963, art 1, § 2 states:
No person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin. The legislature shall implement this section by appropriate legislation.
The Civil Rights Act was enacted as 1976 PA 453. Its purpose was two-fold. First, it was intended to centralize and make uniform the patchwork of then-existing civil rights statutes applying to the private sector, such as the Fair Housing Act, the Fair Employment Practices Act, and the Public Accommodations Act. See Dep't of Civil Rights ex rel. Forton v. Waterford Twp. Dep't of Parks & Recreation, 425 Mich. 173, 187-188, 387 N.W.2d 821 (1986). Second, it was intended to broaden the scope of the then-existing civil rights statutes to include governmental action:
[T]he Legislature's addition of "public service" to [subsection] 302(a), thereby including state action violations that amount to constitutional deprivation with private sector, non-state action legislative violations, can be explained by the fact that article 1, § 2 of the Michigan Constitution *375 provides: "the legislature shall implement this section by appropriate legislation." It is the only provision of the Declaration of Rights to provide so. [Id., p. 188, 387 N.W.2d 821 (emphasis in the original).]
Thus, insofar as subsection 302(a) of the Civil Rights Act governs "public service," it is essentially a codification of the constitution's Equal Protection and Antidiscrimination Clauses, broadened to include categories not covered under the constitution, such as age, sex, and marital status. See Dep't of Civil Rights, pp. 188-189.
The constitutional equal protection guarantee applies to prisoners. As explained in Jackson v. Bishop, 404 F.2d 571, 576 (C.A.8, 1968):
Lawful incarceration may properly operate to deprive the convict of certain rights which would otherwise be his to enjoy. A classic example is [the] denial to the felon of the right to vote....

* * * * * *
On the other hand, a prisoner of the state does not lose all his civil rights during and because of his incarceration. In particular, he continues to be protected by the due process and equal protection clauses which follow him through the prison doors. [Citations omitted.]
Because, as our Supreme Court has stated, the protections of subsection 302(a) of the Civil Rights Act were intended to be coextensive with the Equal Protection and Antidiscrimination Clauses of the Michigan Constitution, and because prisoners do not lose their right to equal protection by virtue of their status as inmates, we can only conclude that the Legislature also intended all personsincluding inmatesto be protected under subsection 302(a).
Further, as noted by the trial court, nowhere does the language of the Civil Rights Act purport to preclude its application because of a person's status as a prisoner or inmate. Compare Walters v. Dep't of Treasury, 148 Mich.App. 809, 819, 385 N.W.2d 695 (1986); Marsh v. Dep't of Civil Service, 142 Mich.App. 557, 569, 370 N.W.2d 613 (1985). When the Legislature has seen fit to exclude prisoners from the provisions of a statute, it has specifically done so. See, e.g., M.C.L. § 15.231(2); MSA 4.1801(1)(2), excluding "those persons incarcerated in state or local correctional facilities" from provisions of the Freedom of Information Act. A court must not judicially legislate by adding into a statute provisions that the Legislature did not include. Empire Iron Mining Partnership v. Orhanen, 455 Mich. 410, 421, 565 N.W.2d 844 (1997). Accordingly, we decline to read into the Civil Rights Act an exclusion barring prisoners from bringing an action under subsection 302(a).

IV
Defendants suggest that any holding that the Civil Rights Act applies to prisoners will unacceptably impair the MDOC's corrections responsibilities. Their fear is unwarranted. At least to the extent that a state agency's conduct is at issue, the protections of subsection 302(a) of the Civil Rights Act were intended to be coextensive with those of the Antidiscrimination and Equal Protection Clauses of the constitution. Dep't of Civil Rights, supra, p. 188, 387 N.W.2d 821. As our Supreme Court stated in Dep't of Civil Rights, supra, p. 189, 387 N.W.2d 821:
Discrimination, in constitutional terms, refers to baseless and irrational line drawing.... When there is a sufficiently important governmental interest and the classification is adequately related to that interest, it does not amount to discrimination to draw legislative lines on the basis of those classifications.
It would be anomalous at best and contradictory at worst to attempt to rid the state of discriminatory practices by the use of an arbitrary standard that would prohibit, in effect, any line drawn between the genders, regardless of its relevance to the purpose of the regulation, unless the Legislature, in its wisdom and its own good time, countervails it.
Thus, even though we hold that subsection 302(a) prohibits the MDOC from engaging in discriminatory practices in the operation of its correctional facilities, the MDOC may still treat prisoners differently on the basis of gender, provided that the gender-based *376 treatment can pass constitutional muster. As the Court acknowledged in Dep't of Civil Rights, merely because the state engages in a practice that treats men and women differently, it does not necessarily mean that it engages in unlawful gender discrimination. Rather, the test is whether the gender-based treatment serves a sufficiently important governmental interest and is substantially related to the achievement of that interest. Dep't of Civil Rights, supra, p. 189, 387 N.W.2d 821. The MDOC may therefore treat prisoners differently on the basis of gender without violating subsection 302(a), as long as the gender-based treatment serves important penological interests and is substantially related to the achievement of those interests.
This approach to state sex discrimination claims by inmates mirrors not only the analysis employed in equal protection cases, but also the analyses typically employed by federal courts in 42 USC 1983 actions. See anno: Sex discrimination in treatment of jail or prison inmates, 12 A.L.R.4th 1219. Because the MDOC admits that prisoners may bring equal protection claims under § 1983, our holding that prisoners are not excluded from the protections of subsection 302(a) of the Civil Rights Act should impose upon defendants no stricter standards than those to which they must presently adhere in order to survive either a constitutional or § 1983 challenge.

V
Finally, defendants argue that the Court of Claims, not the circuit court, had subject-matter jurisdiction over plaintiffs' case. While it is generally true that the Court of Claims has exclusive jurisdiction over "all claims and demands, liquidated and unliquidated, ex contractu and ex delicto, against the state" or any of its agencies, M.C.L. § 600.6419(1)(a); MSA 27A.6419(1)(a), that exclusivity does not extend to Civil Rights Act claims. MCL 37.2801(1); MSA 3.548(801)(1); Rangel v. Univ. of Michigan, 157 Mich.App. 563, 564-565, 403 N.W.2d 836 (1987). Moreover, a complaint against the state seeking only equitable or declaratory relief must be filed in the circuit court. Watson v. Bureau of State Lottery, 224 Mich.App. 639, 643, 569 N.W.2d 878 (1997), Silverman v. Univ. of Michigan Bd. of Regents, 445 Mich. 209, 217, 516 N.W.2d 54 (1994). Because plaintiffs no longer are seeking money damages, the circuit court, rather than the Court of Claims, had jurisdiction to consider the Civil Rights Act claims, as well as the remaining equitable and declaratory claims against the MDOC and defendant McGinnis in his official capacity as the director of the MDOC.
The circuit court also had jurisdiction over plaintiffs' Civil Rights Act claims against the remaining individual defendants. MCL 600.6419(1)(a); MSA 27A.6419(1)(a). Moreover, the defendant guards and wardens are not state officers who may be sued in the Court of Claims. Lowery v. Dep't of Corrections, 146 Mich.App. 342, 349, 380 N.W.2d 99 (1985); Burnett v. Moore, 111 Mich.App. 646, 648-649, 314 N.W.2d 458 (1981); Bandfield v. Wood, 104 Mich.App. 279, 282, 304 N.W.2d 551 (1981). Accordingly, we find no error in the circuit court's ruling that it had jurisdiction to hearing plaintiffs' claims.
Affirmed.
GAGE, J., concurred.
O'CONNELL, P.J. (dissenting.)
My views with respect to the legal issues here presented have already been published at length in what was then a majority opinion, Neal v. Dep't of Corrections, 230 Mich.App. 202, 583 N.W.2d 249 (1998), and I readopt that opinion without repeating it. All that needs now to be added is comment concerning the application to this case of the decision in Pennsylvania Dep't of Corrections v. Yeskey, 524 U.S. 206, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998).
In Yeskey, the United States Supreme Court was faced with determining, under the federal jurisprudential standards for statutory construction of legislation affecting states' rights, whether title II of the Americans with Disabilities Act of 1990(ADA), 42 USC 12131 et seq., applies to state correctional facilities. The language used by Congress embraced within the ambit of the ADA "the services, programs, or activities of a public entity," 42 USC 12132, with "public entity" being defined as including "any department, agency, *377 special purpose district, or other instrumentality of a State or States or local government," 42 USC 12131(1)(B).
The facts in Yeskey involved a Pennsylvania program, the motivational boot camp, that offered the plaintiff inmate the opportunity, if successfully undertaken, of reducing his minimum incarceration before parole from eighteen months to six months. 118 S.Ct. at 1953. Because Yeskey was hypertensive, the Pennsylvania Department of Corrections concluded that his participation in the boot camp program was medically contraindicated, and it refused to admit him to the program. Yeskey then claimed that this was discrimination proscribed by the ADA. The Supreme Court held that the statutory definition of a "qualified individual with a disability," 42 USC 12131(2), does not exclude prisoners, rejecting the contention that the terms "eligibility" and "participation" necessarily imply a prerequisite voluntariness that is inherently lacking in the case of persons confined against their will.
In contrast to the ADA, the Civil Rights Act (CRA), M.C.L. § 37.2101 et seq.; MSA 3.548(101) et seq., defines "public service" so as to include only entities that "provide service to the public." MCL 37.2301(b); MSA 3.548(301)(b).[1] State prisoners, by definition, are not part of the general public to whom any otherwise public service proffered by the Michigan Department of Corrections can be provided. This limitation of the definition of "public service" is conspicuously absent from the definition of "public entity" found in the ADA, which has no corresponding language of limitation.[2] The MDOC is subject to the CRA, as we held in the original majority opinion, to the extent that it opens the doors of any place of confinement under its jurisdiction to visitors, employees, officials, or other persons voluntarily seeking admittance. 230 Mich.App. at 209, 583 N.W.2d 249. Indeed, with respect to employees of the Department of Corrections, the CRA applies by virtue of article 2, which extends the CRA's prohibition of the statutorily enumerated forms of discrimination to the employment relationship, McCallum v. Dep't of Corrections, 197 Mich.App. 589, 496 N.W.2d 361 (1992), rather than article 3, which covers places of public accommodation and public services. The majority's current expansion of the CRA's reach conflates all these crucial distinctions.[3] I am unable to subscribe to the notion that the decision in Yeskey, which involved a different statute, significantly different statutory language, different facts, *378 and different jurisprudential principles of statutory construction, somehow controls the present case or even usefully informs our analysis and decision.
It bears reiteration that, if article 3 of the CRA applies generally to prisons and prisoners, the MDOC may find that it cannot legally maintain separate facilities for men and women[4] and that it may no longer segregate young from old, even though the inevitable result of this judicial stampede toward political correctness will be a penological conflict. The female prisoners will, in general, be terrorized by the male prisoners, who are normally physically larger, stronger, and more aggressive, and likewise the juvenile and geriatric prisoners will be subjected to the predations of the more vigorous adult population. Perhaps these prospects ought to caution plaintiffs to bear in mind the adage to be careful what they wish for, because it may come to pass.
Nothing in the prior majority opinion suggests that any correctional program that may further a prisoner's rehabilitation, or enhance the prospect of pardon, commutation, or parole, may be made available on a basis that discriminates because of gender, race, religion, national origin, or on any other invidious basis. Although that issue is not properly before us, and whatever we say with respect to that issue is obiter dictum, any such programmatic discrimination would appear to fall well within prohibitory penumbra of the federal Civil Rights Act of 1964 concerning race, religion, gender, or national origin, 42 USC 2000a(d), 2000d-4a(1)(A), United States v. Wyandotte Co., 343 F.Supp. 1189 (D.Kan., 1972), rev'd on other grounds 480 F.2d 969 (C.A.10, 1973), and of the ADA relative to disabilities, Yeskey, supra (assuming that either federal enactment may constitutionally be applied to the states at all, an issue reserved for later decision in Yeskey, 118 S.Ct. at 1956). However, MDOC programs do not admit of participation by nonprisoners, that is, by any members of the public (in the sense of making the program available to the public, although members of the public may well participate in a correctional program as leaders, instructors, facilitators, and so forth.). To the extent that outside agencies offer public programs that the MDOC permits prisoners to have access to, those outside agencies, of course, remain precluded by the CRA from discriminating against prisoners by virtue of gender, race, and so forth (but are not limited in discriminating against prisoners as a class per se, as the status of being a prisoner is not covered by the CRA, or by the Civil Rights Act of 1964, Rosado Maysonet v. Solis, 409 F.Supp. 576 [D PR, 1975]).
The present plaintiffs do not allege gender discrimination in prison employment, educational opportunities, or housing, so we need not determine whether other articles of the CRA protect prisoners from discrimination in such contexts. All we face today is a claim of gender discrimination concerning public services *379 under Article 3.[5] Inasmuch as prisons are not, with respect to prisoners, "public services" as defined by the CRA, I would adhere to our initial decision holding that plaintiffs' claim under the CRA should be dismissed pursuant to MCR 2.116(C)(8) for failure to state a claim on which relief may be granted.
I therefore respectfully dissent.
NOTES
[1] One of the goals of the CRA is to prevent discrimination in public accommodations and public services. MCL 37.2102(1); MSA 3.548(102)(1). In my opinion, references to "public accommodation" and "public service" within the CRA are not intended to include establishments that are not open to the general public or that do not provide a service to the public at large. I note that even for purposes of the Civil Rights Act of 1964, "public accommodations" were originally understood to include only such public gathering places as restaurants and theaters. See Olson, The Excuse Factory: How Employment Law is Paralyzing the American Workplace (New York: The Free Press, 1997), p. 50. It should be clear that our Legislature similarly envisioned only entities serving the general public when bringing the CRA to bear on public accommodations and public services.
[2] Section 303 of the CRA provides that "[t]his article shall not apply to ... establishment[s] not in fact open to the public...." Not only are prisons not open to the general public, but their very missionforcibly keeping felons away from the publicrenders them the very antithesis of those public accommodations that offer services to the public. 230 Mich.App. at 214, 583 N.W.2d 249. Even if I were to agree with the majority's liberal definition of the term"public service," I would nonetheless conclude that § 303 created an exemption for prisons.
[3] Plaintiffs advocate a liberal interpretation of the terms "place of public accommodation" and "public service." For the reasons stated in my prior opinion, I believe that a liberal reading of these terms, or any specific term, is inappropriate and dangerous. Defining specific terms in a liberal fashion leads to a slippery slope of absurd results. This Court should not be in the business of adding a liberal meaning to a specific and well-recognized term. An example regarding the term "place of public accommodation" may clarify my concern:

In their brief, plaintiff's allege that prisons are also places of public accommodation as defined by CRA, "because prisons house members of the general public at taxpayers expense." A liberal interpretation of the term "place of public accommodation" would on the surface seem to support their position. However, once this Court adopts plaintiffs' definition, it will not be long before another plaintiff argues that some private residences are also "places of public accommodation." I anticipate the argument would be that because we allow members of the public (our friends, neighbors, and relatives) to spend nights at our homes, and in some cases the government either pays or subsidizes the rent, our private homes are now transformed into places of public accommodation, because they house "members of the public at taxpayers' expense." This slippery slope logic is untenable and, as I have previously stated, inappropriate and dangerous. 230 Mich.App. at 213, 583 N.W.2d 249.
Appropriately the majority has not adopted plaintiffs' definition of "place of public accommodation." However, the majority has adopted plaintiffs' definition of "public service," even though prisons in no way perform a service to the general public. Prisons are not situated similarly to some of our other establishments that do perform a "public service," such as a court, a hospital, or an office of the Secretary of State, all of which were established to provide, and do provide, services to the general public. Id. at 214, 583 N.W.2d 249.
[4] The majority states that "the MDOC may still treat prisoners differently on the basis of gender, provided that the gender-based treatment can pass constitutional muster." Ante at p. 375-76. I suspect that drawing of the line that delineates what "pass[es] constitutional muster" will be no simple task for trial courts; however I suspect that an explosion of prisoner litigation will give the trial courts an ample array of cases to assist them in drawing this line. But I further suspect that the "line" will be anything but clear cut, tending to move in the varied directions of the sensitivities of judges and the objectives of such high-stakes litigation. For these reasons, I choose to draw the line on the basis of the commonly understood meaning of "public service," which I would define to include only entities that are open to the general public or that provide a service to the public at large. This commonsense definition does not embrace the relationship between state prisons and their inmates.
[5] The major flaw in the majority opinion is the treatment of a statutory right as coextensive with a constitutional right. A state statute is by design an entity distinct from a constitutional provision. The majority fails to provide support for its inaccurate conclusion. In fact, there exists a significant difference between a cause of action alleging a violation of the Equal Protection Clause and a cause of action alleging sex discrimination under the CRA. A party proceeding under constitutional equal protection doctrine must prove intentional or purposeful discrimination. Harville v. State Plumbing & Heating, Inc., 218 Mich.App. 302, 306, 553 N.W.2d 377 (1996). In contrast, a party proceeding under the CRA need show only disparate treatment, the prima facie case requiring legally admissible and sufficient evidence that "she was a member of a class deserving of protection under the statute, and that, for the same conduct, she was treated differently [from] a man." Schellenberg v. Roch ester, Michigan, Lodge No. 2225 of Order of Elks, 228 Mich.App. 20, 33, 577 N.W.2d 163 (1998).

The majority's failure to recognize the distinctions between these two bases for litigation is the vehicle through which the majority reaches a result not intended by the drafters of the CRA. The majority posits that "because prisoners do not lose their right to equal protection by virtue of their status as inmates, we can only conclude that the Legislature also intended all personsincluding inmatesto be protected under subsection 302(a)." Ante at p. 375. I agree that inmates do not lose all of their constitutional rights by virtue of their status as inmates. However, this conclusion by no logical path leads to the corollary that a state statute is intended to apply to prisoners. This holds especially in light of § 303's exclusion of "establishments not in fact open to the public," plus the majority's observation that the CRA's protection against sex discrimination exceeds the expressed scope of our state constitution.