601 N.W.2d 696 (1999)
Jane DOE and Joan Roe, on behalf of themselves and all others similarly situated, Plaintiffs-Appellants,
v.
MICHIGAN DEPARTMENT OF CORRECTIONS, Defendant-Appellee.
Docket No. 200810.
Court of Appeals of Michigan.
Released June 25, 1999, at 10:00 a.m.
Vacated July 9, 1999.
Released for Publication October 8, 1999.
Before RICHARD ALLEN GRIFFIN, P.J., and McDONALD and WHITE, JJ.

*697 ORDER
Doe v. Dep't of Corrections, Docket No. 200810. The Court orders that a special panel shall be convened pursuant to MCR 7.215(H) to resolve the conflict between this case and Neal v. Dep't of Corrections (On Rehearing), 232 Mich.App. 730, 592 N.W.2d 370 (1998).
The Court further orders that the opinion in this case released June 25, 1999, is hereby vacated.
The appellant may file a supplemental brief within 28 days of the Clerk's certification of this order. Appellant may file a supplemental brief within 21 days of service of appellant's brief. Nine copies must be filed with the Clerk of the Court.
RICHARD ALLEN GRIFFIN, P.J.
This is a class action brought by current or former prisoners under the jurisdiction of defendant, Michigan Department of Corrections (MDOC), on behalf of all prisoners who, pursuant to MDOC policy, were denied placement in community residential programs (CRP), camps, and farms on the basis of their HIV-positive status. Plaintiffs alleged that MDOC's policy directive, PD-DWA-42.08,[1] governing the "control of communicable blood-borne diseases (AIDS, Hepatitis B)," violated their constitutional due process and equal protection rights,[2] Const. 1963, art. 1, §§ 2, 17, violated the constitutional prohibition against cruel or unusual punishment, Const. 1963, art. 1, § 16, and violated the Michigan Handicappers' Civil Rights Act (HCRA), M.C.L. § 37.1101 et seq.; MSA 3.550(101) et seq. Before trial, the court granted summary disposition in favor of defendant regarding all claims except that alleging violation of plaintiffs' equal protection rights under the Michigan Constitution, Const. 1963, art. 1, § 16. The trial court also denied plaintiffs' motion to amend their complaint to add claims under the Rehabilitation Act, 29 U.S.C. 701 et seq., and the Americans with Disabilities Act (ADA), 42 U.S.C. 12101 et seq. Following a bench trial, the court ruled that plaintiffs had failed to sustain their burden of proof with respect to their equal protection claim and entered judgment in favor of defendant. Plaintiffs appeal as of right from the trial court's order granting summary disposition regarding their HCRA claim, the order denying their motion to amend the complaint, and the judgment for defendant pertaining to the alleged violation of equal protection rights.[3] *698 Were we permitted, we would affirm in part and reverse in part for the reasons set forth in the majority opinion in Neal v. Dep't of Corrections, 230 Mich.App. 202, 583 N.W.2d 249 (1998) (Neal I), and Judge O'Connell's dissent in Neal v. Dep't of Corrections (On Rehearing), 232 Mich.App. 730, 743, 592 N.W.2d 370 (1998)(Neal II). However, pursuant to MCR 7.215(H), we must follow and apply the holding of the majority opinion in Neal II, which compels us to reverse and remand.

I
Plaintiffs first contend that the trial court erred in ruling that they failed to state a claim for relief under the HRCA. The trial court's ruling on a motion for summary disposition is reviewed de novo. Pinckney Community Schools v. Continental Casualty Co., 213 Mich.App. 521, 525, 540 N.W.2d 748 (1995). When reviewing a motion decided under MCR 2.116(C)(8), the Court accepts as true all factual allegations and any reasonable inferences drawn from them in support of the claim. Summary disposition for failure to state a claim should be upheld only when the claim is so clearly unenforceable as a matter of law that no factual development could establish the claim and thus justify recovery. Stott v. Wayne Co., 224 Mich.App. 422, 426, 569 N.W.2d 633 (1997).
The HCRA provides in part as follows:
Except where permitted by law, a person shall not:
(a) Deny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of a place of public accommodation or public service because of a handicap that is unrelated to the individual's ability to utilize and benefit from the goods, services, facilities, privileges, advantages, or accommodations or because of the use by an individual of adaptive devices or aids. [MCL 37.1302(a); MSA 3.550(302)(a).]
A "public service" is defined as "a public facility, department, agency, board, or commission, owned, operated, or managed by or on behalf of this state or a subdivision of this state, a county, city, village, township, or independent or regional district in this state, or a tax exempt private agency established to provide service to the public." MCL 37.1301(b); MSA 3.550(301)(b).
Section 303 of the HCRA creates an exemption for private establishments. It provides:
This article shall not apply to a private club, or other establishment not in fact open to the public, except to the extent that the goods, services, facilities, privileges, advantages, or accommodations of the private club or establishment are made available to the customers or patrons of another establishment that is a place of public accommodation, or if it is licensed, chartered, or certified by the state or any of its political subdivisions. [MCL 37.1303; MSA 3.550(303).]
The question raised by plaintiffs regarding the applicability of the HCRA to prisons and inmates presents an issue of first impression in this state. However, in the recently released decision in Neal II, supra, this Court applied the Michigan Civil Rights Act, M.C.L. § 37.2101 et seq.; MSA 3.548(101) et seq., to prisoners housed in MDOC facilities. Although we disagree with the rationale and result of Neal II, we conclude that the circumstances in Neal II *699 parallel the circumstances in the present case to such an extent that the holding in Neal II dictates the resolution of the present issue.
Subsection a of § 302 of the Civil Rights Act provides:
Except where permitted by law, a person shall not:
(a) Deny an individual the full and equal employment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service because of religion, race, color, national origin, age, sex, or marital status. [MCL 37.2302(a); MSA 3.548(302)(a).]
The Civil Rights Act's definition of a "public service" is similar to that of the HCRA; it defines the term as "a public facility, department, agency, board, or commission, owned, operated, or managed by or on behalf of the state, a political subdivision, or an agency thereof, or a tax exempt private agency established to provide public service." MCL 37.2301(b); MSA 3.548(301)(b). Finally, the Civil Rights Act provides an exemption for private clubs nearly identical to that set forth in the HCRA. It provides:
This article shall not apply to a private club, or other establishment not in fact open to the public, except to the extent that the goods, services, facilities, privileges, advantages, or accommodations of the private club or establishment are made available to the customers or patrons of another establishment that is a place of public accommodation or is licensed by the state.... [MCL 37.2303; MSA 3.548(303).]
In Neal I, supra, the parties posited nearly the same arguments raised here. The plaintiff prisoners
argue[d] that MDOC correctional facilities are places of "public service" under § 301 and subsection 302(a), and thus that discrimination against inmates, based on sex, is prohibited in such facilities. Defendants assert[ed] that if the MDOC is a "public service," its prisons are not required to comply with subsection 302(a) because they fall within the § 303 exemption for "private club[s], or other establishment[s] not in fact open to the public...."[Id. at 209, 583 N.W.2d 249.]
The Neal I majority concluded that it could "perceive no legislative intent to extend the dictates of the Civil Rights Act to prisoners" and thus "reject[ed] a reading of the act that would include prisons within its ambit in their dealings with prisoners." Id. at 209-210, 583 N.W.2d 249. The Court's rationale for rejecting a prison as a place of public service is just as applicable to the HCRA as it is to the Civil Rights Act:
It is important to remember that subsection 301(b) does not stipulate which buildings or agencies are included within the scope of the act, nor does it define the individuals that are or are not covered by the act. It defines the term" public service." The key phrase in this subsection is: "established to provide service to the public." The concurring opinion concludes that because the MDOC is a state "department" or "agency," then the Civil Rights Act must apply to any facilities that it operates; this interpretation is an oversimplification of the definition. No reasonable reading of the statute would conclude that "public service" merely means a department or agency. If the concurring opinion is correct, there would be no need to use or define the term "public service," because "government" would subsume the entire spectrum....
The definition of "public service" in subsection 301(b) reads, in pertinent part: "`Public service' means a ... department [or] agency ... owned, operated, or managed by or on behalf of the state ... established to provide service to the public." Prisons are not established to provide service to the public (at least not to a public that includes prisoners). Indeed, they are designed *700 to do just the oppositeto keep incarcerated individuals from the public. A prison is not like a court, a hospital, or the office of the Secretary of the State, all of which were established to provide, and do provide, "service to the public."
It could be argued that prisons serve the public by confining individuals who commit felonies. However, this, in our opinion, is not the equivalent of "established to provide service to the public." If the concurring opinion is correct, then every act done by prison officials could subject those officials and the MDOC to a discrimination lawsuit.... We do not believe that this was the intended result of the Civil Rights Act. Prisoners simply are not protected against discrimination by the act (which is by no means to say that they are entirely unprotected; whatever restraints exist, however, are found outside the four corners of the act).
We conclude that in order for an agency or department to fall within the scope of the Civil Rights Act, it must be "established to provide service to the public." While prisons may perform a public service by confining those who have been convicted of serious crimes, they are not established as a "place of public accommodation" or as an agency that provides "service to the public." Given our conclusion, we reject any interpretation of the Civil Rights Act that would bring prisons within its scope and subject prison personnel to discrimination lawsuits brought by prisoners pursuant to the act. [ Id. at 213-215, 583 N.W.2d 249 (emphasis added).]
This Court subsequently granted rehearing in Neal I to consider the effect, if any, of Pennsylvania Dep't of Corrections v. Yeskey, 524 U.S. 206, 118 S.Ct. 1952, 1954-1955, 141 L.Ed.2d 215, 219 (1998), in which the United States Supreme Court held that the plain language of the ADA, which prohibits discrimination by a "public entity" against individuals with disabilities, 42 U.S.C.12132, and which defines a "public entity" to include "any department, agency, special purpose district, or other instrumentality of a State or States or local government," 42 U.S.C. 12131(1)(B), unambiguously and "unmistakably includes State prisons and prisoners within its coverage." On rehearing, the majority in Neal II, supra at 736, 592 N.W.2d 370, held in pertinent part:
The Supreme Court's reasoning in Yeskey applies equally to this case. Under subsection 301(b), a "public service" includes "a public facility, department, agency, board, or commission, owned, operated, or managed by or on behalf of the state...." The MDOC is a state agency, and this state's correctional facilities are operated by it. Any "exception that could cast the coverage of prison into doubt," 118 S.Ct. [at] 1954, is conspicuously absent from the unambiguous statutory language of the Civil Rights Act. Thus, under the plain language of subsection 301(b), the MDOC clearly falls within the broad statutory definition of a "public service."
Although this Court has said that the similarities in purpose and some definitions make it "appropriate to look at the Rehabilitation Act and the ADA for guidance in interpreting" the HCRA, Stevens v. Inland Waters, Inc., 220 Mich.App. 212, 217, 559 N.W.2d 61 (1996), we conclude in these particular circumstances, contrary to the majority's decision in Neal II, that such an analogy is inappropriate and that Yeskey therefore does not affect this Court's ruling in Neal I. Yeskey is premised on the interpretation of an act involving "services, programs, or activities of a public entity" and defines a "public entity" to include any state agency or department. Neal I, on the other hand, interprets a statute involving goods and services provided by a public service and defines a "public service" to include a state agency or department "established to provide service to the public." While a prison may provide inmates with the benefit of services, programs, and activities, it was not *701 established for the purpose of providing them to the public. Neal I, supra. The Neal II majority ignores this crucial difference in the state and federal acts and, for this reason, Judge O'Connell dissented in Neal II, supra at 744-746, 592 N.W.2d 370:
In contrast to the ADA, the Civil Rights Act (CRA), M.C.L. § 37.2101 et seq.; MSA 3.548(101) et seq., defines "public service" so as to include only entities that "provide service to the public." MCL 37.2301(b); MSA 3.548(301)(b). State prisoners, by definition, are not part of the general public to whom any otherwise public service proffered by the Michigan Department of Corrections can be provided. This limitation of the definition of "public service" is conspicuously absent from the definition of"public entity" found in the ADA, which has no corresponding language of limitation. The MDOC is subject to the CRA, as we held in the original opinion, to the extent that it opens the doors of any place of confinement under its jurisdiction to visitors, employees, officials, or other persons voluntarily seeking admittance. 230 Mich.App. [at] 209 [583 N.W.2d 249]. Indeed, with respect to employees of the Department of Corrections, the CRA applies by virtue of article 2, which extends the CRA's prohibition of the statutorily enumerated forms of discrimination to the employment relationship, McCallum v. Dep't of Corrections, 197 Mich.App. 589, 496 N.W.2d 361 (1992), rather than article 3, which covers places of public accommodation and public services. The majority's current expansion of the CRA's reach conflates all these crucial distinctions. I am unable to subscribe to the notion that the decision in Yeskey, which involved a different statute, significantly different statutory language, different facts, and different jurisprudential principles of statutory construction, somehow controls the present case or even usefully informs our analysis and decision.
We find Judge O'Connell's reasoning to be persuasive and equally applicable to the present circumstances. Nonetheless, we are constrained by MCR 7.215(H) to follow the majority opinion in Neal II. Both the HCRA and the Civil Rights Act have similar purposes, i.e., the prevention of discrimination in employment, housing, and other real estate and to ensure full and equal utilization of public accommodations, public services, and educational facilities, M.C.L. § 37.1102(1); MSA 3.550(102)(1), M.C.L. § 37.2102(1); MSA 3.548(102)(1), and both acts define a public service in almost identical terms, that being essentially some "agency established to provide service to the public." MCL 37.1301(b); MSA 3.550(301)(b), M.C.L. § 37.2301(b); MSA 3.548(301)(b). Because prison inmates are protected by the Civil Rights Act under Neal II, it necessarily follows that prison inmates are also protected by the HCRA. We apply the holding of Neal II only because we are required to do so pursuant to MCR 7.215(H). Under Neal II, we reluctantly rule that the trial court erred in finding that plaintiffs had failed to state a claim for relief under the HCRA. Were we allowed, we would follow the better-reasoned approach of Neal I and Judge O'Connell's dissent in Neal II and affirm the holding of the trial court regarding this issue.

II
Plaintiffs next contend that the trial court abused its discretion in denying their motion for leave to amend their complaint to add claims under the Rehabilitation Act and the ADA. We agree.
A motion to amend pleadings is a matter "within the sound discretion of the trial court and reversal is only appropriate when the trial court abuses that discretion." Weymers v. Khera, 454 Mich. 639, 654, 563 N.W.2d 647 (1997). A motion to amend pleadings should ordinarily be granted absent such factors as undue prejudice to the opposing party, undue delay, *702 bad faith, or dilatory motive on the movant's part, or where the proposed amendment would be futile. Ben P Fyke & Sons v. Gunter Co., 390 Mich. 649, 656, 213 N.W.2d 134 (1973).
The trial court ruled that the proposed amendment would have prejudiced defendants because it was sought on the eve of mediation, which had been scheduled with great difficulty before a special panel, and because plaintiffs had been aware of potential claims under the federal antidiscrimination acts for some time. However,"[d]elay without more, such as undue prejudice, does not mandate the denial of a motion to amend." Traver Lakes Community Maintenance Ass'n v. Douglas Co., 224 Mich.App. 335, 343-344, 568 N.W.2d 847 (1997). Plaintiffs filed their motion several months in advance of trial and there was no indication that mediation could not have been rescheduled within a reasonable time in advance of trial. Similarly, there was no finding that plaintiffs' delay was due to bad faith or dilatory motive. Therefore, we conclude that the trial court abused its discretion in denying plaintiffs' proposed amendment on the basis of undue prejudice.
The trial court also ruled that the proposed amendment would have been futile because neither the ADA nor the Rehabilitation Act applied to prisons and claims by prison inmates. At the time the trial court ruled on plaintiffs' motion to amend, the state of the law regarding the applicability of these acts to prisons and prison inmates was unsettled. Subsequently, however, the United States Supreme Court rendered its opinion in Yeskey, supra, holding that the plain language of the ADA unambiguously and "unmistakably includes State prisons and prisoners within its coverage," and finding that the text of the act provided no basis for distinguishing the programs, services, and activities provided by prisons to their inmates from those provided by other public utilities. Because the Rehabilitation Act "is materially identical to and the model for the ADA, ... except that it is limited to programs that receive federal financial assistance," Crawford v. Indiana Dep't of Corrections, 115 F.3d 481, 483 (C.A.7, 1997), we conclude that the Rehabilitation Act would, under the analysis in Yeskey, supra, apply to state prisons that receive federal financial assistance and to their prisoners. Thus, the trial court erred (albeit without the benefit of hindsight available to this Court) in denying plaintiffs' proposed amendment to their complaint. However, again echoing the concerns expressed in Neal I and Judge O'Connell's dissent in Neal II, we reiterate our misgivings about such a result. While we follow Yeskey, we urge Congress to amend the ADA to exclude prisoners from the class of persons entitled to protection under the act.

III Finally, plaintiffs contend that the trial court erred in finding that they had failed to sustain their burden of proof with regard to their equal protection claim at trial. This Court reviews the trial court's findings of fact in a bench trial for clear error. Featherston v. Steinhoff, 226 Mich.App. 584, 587, 575 N.W.2d 6 (1997). A finding is clearly erroneous when, although evidence supports it, this Court is left with a firm conviction that the trial court made a mistake. Id. The trial court's conclusions of law are reviewed de novo for error. Omnicom of Michigan v. Giannetti Investment Co., 221 Mich.App. 341, 348, 561 N.W.2d 138 (1997). "A new trial is appropriate when an error of law has occurred in the proceedings." Schellenberg v. Rochester, Michigan, Elks Lodge No. 2225, 228 Mich.App. 20, 31, 577 N.W.2d 163 (1998).
The trial court's initial finding regarding the length of time that the MDOC utilized a blanket prohibition policy is supported by the evidence and is not clearly erroneous. Lumley v. Univ. of Michigan Bd. of Regents, 215 Mich.App. 125, 135, 544 N.W.2d 692 (1996). However, we conclude that the trial court erred in finding that *703 MDOC's 1990 revised policy was not an issue to be considered in plaintiffs' constitutional claim. The prisoners who were rejected from consideration for CRP placement on the basis of their medical eligibility under the revised policy were HIV positive and thus within the class certified by the court.
We further conclude that the trial court's application of the rational basis test, People v. Pitts, 222 Mich.App. 260, 272-273, 564 N.W.2d 93 (1997), to plaintiffs' equal protection claim was inappropriate. Because this case involves prison policy rather than legislation, a traditional equal protection analysis is not utilized.
Rather, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Turner v. Safley, 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). Although this test is essentially the same as the rational basis test (a statute is valid "if the classification scheme it has created is rationally related to a legitimate governmental purpose," Pitts, supra at 273, 564 N.W.2d 93), its application requires consideration of four factors: (1) whether there is "a `valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it," (2) "whether there are alternative means of exercising the right that remain open to prison inmates," (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally," and (4) whether the regulation "is an `exaggerated response' to prison concerns" or there really are no alternatives "that fully accommodate the prisoner's rights at de minimus cost to valid penological interests." Turner, supra at 89-91, 107 S.Ct. 2254.[4] Plaintiffs bear the burden of showing that the challenged regulation is unreasonable under Turner. Casey v. Lewis, 4 F.3d 1516, 1520 (C.A.9, 1993).
Because the trial court in the instant case applied the wrong legal analysis to plaintiffs' equal protection claim and in so doing failed to consider the necessary factors for determining the constitutional validity of prison policy, we reverse the judgment of the trial court and remand for reconsideration of plaintiffs' constitutional claim under the test set forth in Turner, supra.
Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.
McDONALD, J., concurs.
WHITE, J. (concurring).
The majority agrees with the reasoning of the Neal I[1] majority and of the dissenting judge in Neal II[2] that prisoners fall outside the coverage of the Civil Rights Act (CRA), M.C.L. § 37.2101 et seq.; MSA 3.548(101) et seq., because prisons are not "established to provide public service," and concludes that prisoners also fall outside the coverage of the Persons with Disabilities Civil Rights Act (PWDCRA), M.C.L. § 37.1101 et seq.; MSA 3.550(101) et seq., formerly the Handicappers' Civil Rights Act (HCRA),[3] which defines "public service" similarly. I disagree.
The PWDCRA defines "public service" as:

*704 "Public service" means a public facility, department, agency, board, or commission, owned, operated, or managed by or on behalf of this state or a subdivision of this state, a county, city, village, township, or independent or regional district in this state, or a tax exempt private agency established to provide service to the public. [MCL 37.1301(b); MSA 3.550(301)(b) (emphasis added).]
The CRA defines "public service" as:
"Public service" means a public facility, department, agency, board, or commission, owned, operated, or managed by or on behalf of the state, a political subdivision, or an agency thereof, or a tax exempt private agency established to provide service to the public. [MCL 37.2301(b); MSA 3.548(301)(b) (emphasis added).]
Neither the plain language of the CRA or the PWDCRA nor the result reached upon application of rules of statutory interpretation to the definitions of "public service" support the result reached in Neal I.
The CRA and the PWDCRA, being remedial in nature, are to be construed liberally. Chmielewski v. Xermac, Inc., 457 Mich. 593, 601, 580 N.W.2d 817 (1998); Allen v. Southeastern Michigan Transportation Authority, 132 Mich.App. 533, 537, 349 N.W.2d 204 (1984), citing 90 A.L.R.3d 393, 393-394. The plain language of the PWDCRA nowhere excludes prisons from its coverage,[4] referring throughout to "persons" and "individuals" with disabilities. The absence of a comma after "private agency" in both the PWDCRA's and CRA's definitions of "public service" supports that the phrase "established to provide service to the public" modifies only "a tax exempt private agency." See Eskridge & Frickey, Cases and Materials on Legislation, ch. 7, § 2, p. 644 (noting that "`[e]vidence that a qualifying phrase is supposed to apply to all antecedents instead of only to the immediately preceding one may be found in the fact that it is separated from the antecedents by a comma,'" quoting 2A Sutherland Statutory Construction (4th ed.), § 47.33, p. 245.) "Qualifying words and phrases in a statute refer solely to the last antecedent in which no contrary intention appears." Weems v. Chrysler Corp., 448 Mich. 679, 700, 533 N.W.2d 287 (1995). In this instance, the modifying clause ("established to provide service to the public") is confined to the last antecedent ("a tax exempt private agency"). Nothing in the subject matter or dominant purpose of the statute requires a different interpretation.
Analysis of PWDCRA claims is largely parallel to analysis under the ADA; the statutes have similar purposes and definitions. Chmielewski, supra at 602, 580 N.W.2d 817; Collins v. Blue Cross Blue Shield of Michigan, 228 Mich.App. 560, 568, 579 N.W.2d 435 (1998); see also Monette v. Electronic Data Systems Corp., 90 F.3d 1173, 1178, n. 3 (C.A.6, 1996). The provisions of the ADA at issue in Pennsylvania Dep't of Corrections v. Yeskey, 524 U.S. 206, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998), provide:
Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity. [42 U.S.C. 12132 (emphasis added).]
Subsection 1 of § 12131 of the ADA, 42 U.S.C. 12131(1), defines "public entity" as
(A) any State or local government;
(B) any department, agency, special purpose district, or other instrumentality of a State or States or local government;

*705 (C) the National Railroad Passenger Corporation, and any commuter authority....
When the PWDCRA provision defining "public service" is interpreted as discussed above, it becomes analogous in its coverage to the ADA provision defining "public entity." While the majority notes its agreement with the Neal I Court's determination that "[n]o reasonable reading of the statute [CRA] would conclude that `public service' merely means a department or agency," ante, p. 699, the ADA operates precisely in that fashion, and the PWDCRA is the Michigan analog of the ADA.
The analysis of a unanimous United States Supreme Court in Yeskey, supra, provides guidance in interpretation of the PWDCRA as well:
Here, the ADA plainly covers state institutions without any exception that could cast the coverage of prisons into doubt. Title II of the ADA provides that:
"Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.
State prisons fall squarely within the statutory definition of "public entity," which includes "any department, agency, special purpose district, or other instrumentality of a State or States or local government." § 12131(1)(B).
Petitioners contend that the phrase "benefits of the services, programs, or activities of a public entity," § 12132, creates an ambiguity because state prisons do not provide prisoners with "benefits" of "programs, services, or activities" as those terms are ordinarily understood. We disagree. Modern prisons provide inmates with many recreational "activities," medical "services," and educational and vocational "programs," all of which at least theoretically" "benefit" the prisoners (and any of which disabled prisoners could be "excluded from participation in").... The text of the ADA provides no basis for distinguishing these programs, services, and activities from those provided by public entities that are not prisons.

...
Finally, petitioners point out that the statute's statement of findings and purpose, 42 U.S.C. § 12101, does not mention prisons and prisoners.... [A]ssuming [that] to be true, and assuming further that it proves, as petitioners contend, that Congress did not "envisio[n] that the ADA would be applied to state prisoners," Brief for Petitioners 13-14, in the context of an unambiguous statutory text that is irrelevant. As we have said before, the fact that a statute can be "`applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth.'" Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 499, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) (citation omitted). [118 S.Ct. at 1954-1956, 141 L.Ed.2d at 219-220 (emphasis added).]
Additionally, I conclude that the Neal II majority correctly determined that prisons are not exempt under the exemption for private establishments found in § 30.
I agree with the majority's disposition of the remaining issues.
NOTES
[1] PD-DWA-42.08 provided in pertinent part that "[p]risoners with present or past HIV related illness shall not be placed in a community residential program, nor shall they be medically cleared for camps or farms." The blanket prohibition in the directive was revised in June 1990 by DOM 1990-16, which allowed those HIV prisoners who were medically eligible to participate in CRPs if physically able and the projected costs of their care in the community would not greatly exceed the cost of comparable care in MDOC facilities.
[2] Plaintiffs alleged that the 1989 version of PD-DWA-42.08 violated their constitutional rights because it excluded them from participation in CRPs, camps, or farms, for which they were otherwise eligible, based on their HIV-positive status. Although not specified in their complaint, plaintiffs also asserted that the revised version was unlawfully discriminatory because it subjected HIV-positive prisoners to more stringent requirements for CRP placement than other prisoners.
[3] In a prior appeal in this case, Doe v. Dep't of Corrections, unpublished opinion per curiam of the Court of Appeals, issued June 15, 1994 (Docket No. 147293), this Court addressed three issues not presently before the Court, holding in pertinent part:

The trial court erred in granting summary disposition pursuant to MCR 2.116(C)(4) on the ground that jurisdiction over plaintiffs' claims for money damages was in the Court of Claims. While it is generally true that the Court of Claims has exclusive jurisdiction over claims for money damages against the state, that exclusivity does not extend to civil rights claims such as those asserted under the HCRA.... Defendant so concedes. Hence, we reverse the trial court's order granting partial summary disposition to defendant under MCR 2.116(C)(4).
Next, the trial court erred in granting summary disposition as to plaintiffs' claim for injunctive relief on the basis that defendant's amendment of PD-DWA-42.08 rendered this claim moot. In response to defendant's motion, plaintiffs argued that despite the new policy, HIV positive inmates otherwise qualified for placement were not being placed in community facilities. Moreover, the policy as amended continued to deny placement to some HIV positive prisoners based on their CD-4 counts alone. The affidavit submitted in support of defendant's motion contained numerous factual/medical assertions in support of this policy. Plaintiffs' should have been given the opportunity to explore and refute these assertions.
Lastly, the trial court did not clearly err in certifying the class....
[4] To the extent that Turner applies to a prisoner's right to the free exercise of religion, it has been superseded by the Religious Freedom Restoration Act, 42 U.S.C. 2000bb-2000bb-4. See Fawaad v. Jones, 81 F.3d 1084 (C.A.11, 1996); Werner v. McCotter, 49 F.3d 1476 (C.A.10, 1995).
[1] Neal v. Dep't of Corrections, 230 Mich.App. 202, 583 N.W.2d 249 (1998).
[2] Neal v. Dep't of Corrections (On Rehearing), 232 Mich.App. 730, 592 N.W.2d 370 (1998).
[3] 1998 PA 20 renamed the HCRA and changed the term "handicap" to "disability" throughout the act.
[4] Defendants' appellate brief urges that we look not to the PWDCRA's plain language, but to the spirit and purpose of the act: